2010 VT 39

## State of Vermont v. Justin Ford

[998 A.2d 684]

No. 08-490

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 14, 2010

*William J. Porter*, Orange County State's Attorney, Chelsea, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, *Anna Saxman*, Deputy Defender General, and *Dan Stevens*, Legal Intern, Montpelier, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Justin Ford appeals from the judgment of conviction rendered following his conditional pleas to possession of marijuana and possession of narcotics. The defendant claims that the trial court improperly denied his motion to suppress certain evidence seized from his house. We agree and, accordingly, reverse the judgment of the trial court and remand.

¶ 2. Sometime in the early morning of March 20, 2008, an individual called 9-1-1, said his name was Stephen Ford, and said he had been in an accident and was trapped in his vehicle on the Hartford-Quechee Road in Hartford in Windsor County. Stephen Ford is the brother of defendant, Justin Ford. Nothing in the record established the time of the 9-1-1 call. Police and the local EMS squad responded and searched the area, but did not find a damaged car or Stephen Ford in the area. Subsequently, at around 5:20 a.m. on March 20, a Vermont state police trooper from the Middlesex barracks was contacted at her home by her dispatcher and directed to perform a welfare check on Stephen Ford at his last known address on Brook Street in Williamstown in Orange County.

¶ 3. The trooper arrived at the Brook Street address shortly before 6 a.m. and saw one car in the driveway buried by snow. She concluded that it had not been used for awhile. She saw no fresh tire tracks, nor did she see lights on in the house. The only tracks she saw were footprints leading to a basement door of the house adjacent to the driveway. From prior experience with Stephen Ford in an unrelated matter six months earlier, the trooper believed that he lived in the basement of the house. She approached the door and knocked on it a few times, announcing her presence. Hearing no response, the trooper decided to check the remainder of the house. She knew there was another entrance on the north side of the house, but because there was no path through the snow in that direction and because there was a snowmobile track leading around to the south side of the house, she proceeded along the track to the back of the house.

¶ 4. Upon reaching the back of the house, the trooper saw lights coming from the further of two basement windows. Stepping off the snowmobile trail, she approached the house, knocked on the nearer window and announced, "State Police, please come to the door." She did not hear anything from inside, so she approached the lighted window. As she bent down to the window, she saw, through a gap between the curtains, several small marijuana plants growing in a glass aquarium under a bright grow-light. The trooper did not see anyone inside the room, so she halted her search and left the premises.

¶ 5. Based on what she had observed, the trooper obtained a search warrant for the house on Brook Street, which she thought was Stephen Ford's house. At around 3 p.m. that afternoon she and a number of other officers returned and searched the home, seizing a dozen marijuana plants, several oxycodone tablets, and other materials thought to be used in a drug-growing operation. While the search was progressing, the owner of the home — and mother of Justin Ford and Stephen Ford — contacted the trooper to ask why her home was being searched. The trooper informed her of the series of events leading to the search. The caller explained that defendant lived in the home and that Stephen had not lived there for some time. A further search of the home uncovered mail and other personal items addressed to defendant. Defendant was subsequently charged with two misdemeanor counts of possession of marijuana and possession of narcotics.

¶ 6. Before trial, defendant moved to suppress the physical evidence gathered in the afternoon search of his home. Defendant

contested the search on the premise that the warrant authorizing the search was based on the trooper's warrantless early-morning entry onto the grounds of his home and her observations through his window, and thus, the evidence was obtained in violation of his constitutionally protected rights. In opposition, the State claimed that the trooper's entry onto defendant's property was lawful under the emergency aid exception to the warrant requirement. At the evidentiary hearing, the trooper testified to the facts above. Based on this testimony, the trial court denied defendant's motion, finding that the search satisfied the requirements of the emergency aid exception as laid out in *State v. Mountford*, 171 Vt. 487, 769 A.2d 639 (2000). Subsequently, defendant entered into a conditional plea agreement, admitting guilt pending the outcome of this appeal.

¶ 7. On appeal from a denial of a motion to suppress, we review the trial court's findings of fact deferentially and reverse only if the findings are clearly erroneous. *State v. Bryant*, 2008 VT 39, ¶ 9, 183 Vt. 355, 950 A.2d 467. Under this standard, "we will uphold the court's factual findings unless, taking the evidence in the light most favorable to the prevailing party, and excluding the effect of modifying evidence, there is no reasonable or credible evidence to support them." *State v. Rheaume*, 2005 VT 106, ¶ 6, 179 Vt. 39, 889 A.2d 711 (quotation omitted). Whether the facts as found meet the proper standard justifying a particular police action is a question of law. *State v. Mara*, 2009 VT 96A, ¶ 6, 186 Vt. 389, 987 A.2d 939. We review legal issues de novo. *Bryant*, 2008 VT 39, ¶ 9.

¶ 8. Defendant first challenges the trial court's factual findings, arguing that the court erred when it found: (1) that the trooper had seen "recent footprints leading to the basement door"; (2) that it was apparent to the trooper that "someone had recently entered the basement door"; and (3) that it was "implied that there had been no information that [Stephen Ford] had been picked up by anybody and transported to a hospital." In reviewing the trooper's testimony at the suppression hearing, we can find no evidence to support the finding that the footprints or entry into the residence were recent. The trooper's testimony referred only to footprints in the snow; she made no statements about how old or new the tracks may have been, when the last snow had fallen, or any other indicia of when the prints were made. The State argues that the court could make a logical inference that the

tracks were "recent" from the trooper's testimony; however, we fail to see how such an inference can be drawn from testimony establishing only their existence. As to the second challenged finding, as above, we find nothing in the record to support the court's finding that "someone had recently entered the basement door." These findings of the court are not supported by the evidence and are clearly erroneous and cannot be upheld. Defendant's third challenge is not to a finding so much as to a conclusion: "it's implied that there had been no information that [Stephen] had been picked up by anybody and transported to a hospital." This is a reasonable, if immaterial, inference, based on the testimony that Stephen was not located on the Hartford-Quechee Road and the state police had dispatched the trooper to his last known address to look for him. Thus, we find no error in this finding.

¶ 9. Defendant's central argument on appeal is that the trooper's entry onto his property and the resulting discovery of the illegal items constituted a warrantless search of his home in violation of his rights under the Vermont Constitution.[1] Defendant claims that when the trooper walked around his house and peered into the lighted basement window, she invaded the curtilage of his home and effected a search without a warrant. Though defendant recognizes that warrantless searches are permissible under certain circumstances, he contends that this search failed to meet the criteria for the emergency aid exception, and thus, the trial court erred in denying his motion to suppress.

¶ 10. Article 11 of the Vermont Constitution protects the people's right to be free from "unreasonable government intrusions into legitimate expectations of privacy." *Bryant*, 2008 VT 39, ¶ 10 (quotation omitted). The home is "a repository of heightened privacy expectations," and as such, it receives heightened protection under Article 11. *Id.* ¶ 12 (quotation omitted). Because some areas outside the physical confines of a house are so intimately

---

[1] As defendant's argument is grounded solely in the Vermont Constitution, specifically Article 11, we base our decision upon that foundation, pausing only to note that "we have . . . long held that our traditional Vermont values of privacy and individual freedom — embodied in Article 11 — may require greater protection than that afforded by the federal Constitution." *State v. Bauder*, 2007 VT 16, ¶ 10, 181 Vt. 392, 924 A.2d 38. Thus, all references to federal cases are by way of illustration only.

tied to the "privacies of life," we recognize the "same constitutional protection from unreasonable searches and seizures" for this so-called curtilage "as [for] the home itself." *State v. Rogers*, 161 Vt. 236, 241, 638 A.2d 569, 572 (1993) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). An individual's interest in privacy is safeguarded from government intrusion by requiring "advance judicial approval" in the form of a warrant. *Mountford*, 171 Vt. at 489, 769 A.2d at 643 (quotation omitted). This detached review prevents law enforcement from "deciding on their own, without the approval of a neutral judicial officer, to invade a person's privacy" in the absence of "exceptional circumstances." *Id.* (quotation omitted). When government agents conduct a warrantless search, the law presumes such an intrusion into an individual's privacy is unreasonable and a constitutional violation. *Bryant*, 2008 VT 39, ¶ 10. Indeed, such invasions are "permissible only pursuant to a few narrowly drawn and well-delineated exceptions." *Bauder*, 2007 VT 16, ¶ 14; see *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968) (warrantless search must be "strictly circumscribed by the exigencies which justify its initiation").

■ ■ ¶ 11. The emergency aid or emergency assistance exception provides a narrow carve-out from the warrant requirement applicable when law enforcement personnel discover illicit activity while providing emergency aid to protect life or property. See *Mountford*, 171 Vt. at 489-90, 769 A.2d at 643-44 (setting out contours of emergency aid exception); *State v. Connolly*, 133 Vt. 565, 571, 350 A.2d 364, 368 (1975) (recognizing "officers responding to an emergency" as exception to warrant requirement); see also *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ("We do not question the right of the police to respond to emergency situations."). While it is distinct from the community caretaking exception, both involve police operating outside their criminal law enforcement and investigation role, and accordingly the warrant requirement is relaxed. *Mountford*, 171 Vt. at 490 n.*, 769 A.2d at 643 n.*. The "distinguishing feature" of both community caretaking and emergency assistance searches "is that they are generated from a desire to aid victims rather than investigate criminals." *Id.* at 491, 769 A.2d at 645. Because this type of search still constitutes an invasion of an individual's expectation of privacy, however, any resulting search must be strictly circumscribed by the emergency which serves to justify it and should not be used to support a general exploratory search. Thus, the need for a warrant is

obviated only when police assistance is necessary to aid persons "seriously injured or threatened with such injury." *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006).

¶ 12. In recognizing the emergency aid exception in *Mountford,* 171 Vt. at 490-91, 769 A.2d at 644, this Court adopted the three-part analysis developed by the New York Court of Appeals in *People v. Mitchell,* 347 N.E.2d 607, 609 (N.Y. 1976), *abrogated as applied to Federal Constitution by Brigham City,* 547 U.S. 398. As with other exceptions to the warrant requirement, "the burden is on the prosecution to show that the search falls into [this exception]." *Mountford,* 171 Vt. at 493, 769 A.2d at 646 (quotation omitted).

¶ 13. The first prong of the *Mountford/Mitchell* test is that "[t]he police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property." *Id.* at 490, 769 A.2d at 644 (quotation omitted). This is an objective inquiry, and the officer's belief "must be grounded in empirical facts rather than subjective feelings." *Mitchell,* 347 N.E.2d at 609-10. Our analysis of this factor, however, is deferential and not an invitation to "evaluate, by hindsight, actions taken by police based on an immediate reaction to the circumstances that faced them." *Mountford,* 171 Vt. at 493, 769 A.2d at 646. At the same time, "the burden is on the prosecution" to prove that the police met the exception's standards. *Id.* (quotation omitted).

¶ 14. The second prong of the *Mountford/Mitchell* test is a subjective analysis into the motivations of the officers involved; they "must not be primarily motivated by intent to arrest and seize evidence." *Id.* at 490, 769 A.2d at 644 (quotation omitted). Since we decided *Mountford,* the United States Supreme Court has held that an "officer's subjective motivation is irrelevant" in determining violations of the Fourth Amendment of the United States Constitution. *Brigham City,* 547 U.S. at 404. Because our holding in this case does not depend on this second prong of the *Mountford/Mitchell* test, we refrain from determining the impact the *Brigham City* ruling has on that facet of our analysis, beyond stating that the other two prongs remain valid.

¶ 15. The third prong of the test limits the permissible scope of any search undertaken as police are giving emergency

assistance. *Mountford*, 171 Vt. at 490, 769 A.2d at 644. Any search must have "some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." *Id.* (quotation omitted). In articulating this factor, the *Mitchell* court noted that this "limited privilege afforded to law enforcement" requires a "direct relationship between the area to be searched and the emergency." 347 N.E.2d at 610. Like the *Mitchell* court, we recognize that "reasonableness of police activity must always pass judicial muster" and any search under the guise of the emergency assistance exception must do likewise. *Id.* at 611.

¶ 16. The search of defendant's home fails under the first and third prongs set out in *Mountford*. Under the first prong of the test, there was no showing of an immediate need for police assistance at defendant's home based on the facts before the trial court. The genesis of the emergency here was a 9-1-1 call reportedly made by Stephen Ford. Though the record is not clear as to the specifics of the police and emergency personnel response, at the hearing the trooper stated that police and emergency personnel had responded to the Hartford-Quechee Road, but were unable to find the motorist or evidence of any accident. The time of the 9-1-1 call was never established. Nor was it ever established that the caller had claimed any physical injuries.

¶ 17. Furthermore there was no evidence presented as to why the state police in the Hartford area thought the motorist might be in Williamstown. Apparently, a check of the law enforcement database indicated a prior address for Stephen Ford in Williamstown. We take judicial notice that Williamstown is at least forty miles away from the part of the Hartford-Quechee Road closest to Williamstown. With this limited information, the trooper was dispatched to defendant's home to see if Stephen Ford had returned to this residence and needed aid. After arriving at the home, the trooper testified to nothing that would justify a "reasonable belief" that the motorist was inside and in need of immediate assistance. She approached a darkened house with a snowed-in car in the driveway and no sign of inhabitants beyond footprints more recent than the last snowfall. She knocked on the most accessible door multiple times and received no response. Absent any evidence upon which to surmise that Stephen Ford had arrived at defendant's residence, injured or otherwise, between the time of the call and the dispatch of the trooper, it is

difficult to see how the State upheld its obligation to meet the first prong of *Mountford*. The lack of a response to her knocking, without more, was insufficient to support a belief that anyone was inside the house or that there was an immediate need for medical attention. See *Mountford*, 171 Vt. at 493, 769 A.2d at 646 ("[W]e do not believe that either the knowledge that defendant was drunk or the failure of defendant to open the door is sufficient to authorize emergency intervention." (citations omitted)). Without additional evidence at the scene — or before the trial court — there can be no reasonable conclusion that there was an emergency requiring immediate police assistance in defendant's house based solely on the 9-1-1 call.[2]

¶ 18. *Mountford*, itself, is instructive in this regard. There, we recognized that police entry into a home was justified when, responding to reports of a loud party, police saw the defendant in his home, alone, and in an extremely intoxicated state. He did not respond to their knocks or yells or even the beam of a flashlight shined in his eyes. As they watched from outside, he arose and walked into a wall, before stumbling into an adjoining room. Such circumstances, we concluded, would lead a reasonable officer to be concerned for the defendant's well being. *Id.* at 493, 769 A.2d at 646.

¶ 19. In contrast, here, an officer approaching defendant's home, armed only with the knowledge that a motorist had claimed to be trapped in his car miles away, would need more than footprints and a darkened home to reasonably believe emergency assistance was immediately necessary. Unlike other emergency assistance cases wherein courts have upheld police searches of homes connected to reported automobile accidents, here there was insufficient evidence to suggest that an emergency existed inside the home. Cases from sister jurisdictions uniformly involve additional evidence beyond an accident report to justify an officer's entry into a home following a report of a car accident. See, e.g., *City of*

---

[2] It is important to note that this conclusion does not prevent any future welfare checks based on emergency calls. As defendant rightly conceded, the trooper's presence in his driveway and dooryard, and her knock upon his door, did not constitute an unlawful search. See *State v. Ryea*, 153 Vt. 451, 453, 571 A.2d 674, 675 (1990) (driveway, though part of curtilage, "constitutes a semiprivate area" not afforded full constitutional protection). Had she discovered evidence supporting a reasonable belief that there was an immediate need for emergency assistance in those areas, she could have continued her search.

*Troy v. Ohlinger*, 475 N.W.2d 54 (Mich. 1991) (officer responded to report of injury accident, cross-referenced license plate number with residence, and saw damaged car outside home); *City of Fargo v. Ternes*, 522 N.W.2d 176 (N.D. 1994) (responding to hit-and-run injury accident, officers went to residence and saw damaged pickup parked outside with blood on truck seat and on door of residence).

¶ 20. The third prong of *Mountford* was likewise unfulfilled, as the scope of any search justified by the situation that occurred in Hartford as a result of the 9-1-1 call could not extend to the house in Williamstown forty miles away without "some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." 171 Vt. at 490, 769 A.2d at 644 (quotation omitted). By searching the grounds of the home and peering into the basement windows when there was insubstantial evidence at the residence that anyone — let alone the potentially injured motorist — was home, the trooper exceeded the scope of any emergency which arose from a reported car accident, especially given the scant evidence connecting defendant's home with the 9-1-1 call. With the nature of the emergency very vague and no basis to associate defendant's empty house with that emergency, the scope of a permissible search had likewise contracted. Contrary to the State's position that the scope of the search necessarily expanded when police were unable to find the motorist on the Hartford-Quechee Road, with no evidence that the accident had actually happened or that anyone was actually injured, the search could not be enlarged without limit and without reason. Under the circumstances of this case, the State failed to prove that there was a connection between the home and a purported accident scene many miles away.

¶ 21. As the New Hampshire Supreme Court recognized recently in reviewing its emergency aid jurisprudence, in most of the cases "there were alarming or volatile situations warranting [police] entry into the private residences. Even where there is a possible victim within a private dwelling but no volatile situation, we have not found the existence of exigent circumstances . . . ." *State v. Pseudae*, 908 A.2d 809, 813 (N.H. 2006). Such is the case before us today. The State has failed to uphold its burden of demonstrating that the trooper had a reasonable belief that her entry into the home was immediately necessary to protect life and limb. The possibility that the motorist was in defendant's home

and needed aid was a remote possibility, and that alone did not make the police entry into defendant's curtilage and the search of his home reasonable.

*Reversed and remanded.*

¶ 22. **Reiber, C.J.,** dissenting. This case is about the proper scope of the emergency aid exception — an exception that recognizes those situations in which acting quickly to save lives takes priority over privacy interests. The majority holds today that when a police officer is informed of a serious car accident and sent to the accident victim's last known address, the officer should sometimes risk leaving the victim dying in his home rather than investigating the situation further. The majority requires accident victims to leave visible signs, such as blood tracks or a wrecked vehicle, before a police officer, absent any evidence of pretense, can lawfully follow a path around a house and take a cursory look in a window for signs of a person thought to be injured. I would not read the emergency aid exception so narrowly. Although this is a close case, in my view the trooper's actions here were justified by the fact that she was responding to a recognized emergency and had no reason to believe that the emergency had dissipated. I therefore dissent.

¶ 23. A number of courts have recognized that 9-1-1 calls reporting an emergency "can be enough to support warrantless searches." *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000) (citing cases). This is particularly true when the caller has identified himself. *Id.*; see also, e.g., *State v. Matthews*, 2003 ND 108, ¶ 18, 665 N.W.2d 28. When an identified 9-1-1 caller reports an emergency, "[t]he efficient and effective use of the emergency response networks requires that the police (and other rescue agents) be able to respond to such calls quickly and without unnecessary second-guessing." *Richardson*, 208 F.3d at 630. We have similarly stated that police officers must respond quickly and thoroughly to reported emergencies:

> The business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.

*State v. Mountford*, 171 Vt. 487, 493, 769 A.2d 639, 646 (2000) (quotation and internal citation omitted).

¶ 24. In my view, the trial court correctly concluded that the trooper acted reasonably, and there was, therefore, no violation of defendant's privacy interests. Although in retrospect we know that there was not an injured person in defendant's home and that there might not have ever been an actual emergency, these facts were not known to the trooper at the time she arrived at defendant's home. Though such hindsight may be clear today, it cannot affect our analysis. See, e.g., *Hunsberger v. Wood*, 570 F.3d 546, 555 (4th Cir. 2009) (holding that although it turned out that no one was actually in danger, "we cannot judge [the trooper's] search based on what we know in hindsight," because "[a]t the time of the search, there was reason to think [someone] needed help"). Here, the police had received a 9-1-1 call stating that there had been an accident. The accident victim identified himself and said that he was trapped in his car. When an emergency rescue crew was unable to locate anyone where the accident had reportedly occurred, the police followed standard operating procedures and dispatched a trooper to the victim's last known address. When the trooper arrived at the home, she saw footprints in the snow leading to the back of the building. She followed those footprints. After several attempts at knocking and announcing her presence, but hearing no reply, she concluded that an injured person might be unconscious or otherwise incapacitated and therefore unable to answer the door. To determine whether there was a seriously injured person inside the house, she peered through a window.

¶ 25. The trial court held that each step that the trooper took was reasonable. The majority reaches a different conclusion today based upon its finding that "the trooper testified to nothing that would justify a 'reasonable belief' that the motorist was inside and in need of immediate assistance." *Ante*, ¶ 17. The majority's conclusion rests primarily on the following two weaknesses in the State's argument: (1) the trooper traveled to a location that was "at least forty miles" from the reported location of the accident, *ante*, ¶ 17; and (2) upon arriving at the scene, the trooper failed to discover additional "evidence supporting a reasonable belief that there was an immediate need for emergency assistance in those areas," *ante*, ¶ 17 n.2. Although I agree that these facts make this a close case, we have previously noted that in close cases "we should be deferential" to the trooper's evaluation of the situation. *Mountford*, 171 Vt. at 493, 769 A.2d at 646. The majority goes too far in holding that these facts support reversing the trial court's decision.

¶ 26. Distance between the reported location of the accident and the area searched does not necessarily make the search unreasonable. In *Matthews*, for instance, the court upheld the application of the emergency aid exception when police officers searched a residence in Fargo, North Dakota, even though the 9-1-1 call in that case reported that the emergency was occurring a number of miles away in Horace, North Dakota. 2003 ND 108, ¶ 19. The inquiry turns on whether the officer had a reasonable belief that a seriously injured person was in the home. See, e.g., *id.* ¶¶ 43-44 (holding that when police officers responding to an emergency "could have . . . reasonably believed there remained a possibility that [people] may have been inside the house," and entered the house to confirm or dispel this belief, the "scope of the search was reasonable in view of its objectives"). Here, the trooper responding to a reported emergency had a reasonable belief that emergency assistance may have been needed at defendant's home. This belief was supported by the underlying 9-1-1 call reporting a serious accident involving a vehicle off the road without details as to its precise location, combined with the failure of several emergency rescue teams to find the named victim. Based upon this information, the officer could reasonably conclude that the victim might have found his way home, but was still in need of medical assistance. Indeed, that is precisely why police protocol requires a welfare check at the last known residence of someone who is reported as injured.

¶ 27. Because the trooper *already had* a reasonable belief that an emergency existed when the trooper arrived at defendant's home, the trooper did not need to discover additional "evidence supporting a reasonable belief that there was an immediate need for emergency assistance" at the house. *Ante*, ¶ 17 n.2. As the United States Supreme Court recently stated, "[o]fficers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Michigan v. Fisher*, ___ U.S. ___, ___, 130 S. Ct. 546, 549 (2009) (per curiam) (quotation omitted). Similarly, other courts have rejected the requirement that additional evidence — beyond the existence of a recognized emergency — is required before police officers can respond to these emergencies. See, e.g., *Schreiber v. Moe*, 596 F.3d 323, 331 (6th Cir. 2010). In *Schreiber*, the court held that the emergency aid exception applied even though "this case lack[ed] some of the more outward manifestations of violence that often support a

finding of exigency," such as "signs of blood, broken objects, or gunfire." *Id.* (citations omitted). The court noted that blood stains or other outward manifestations of violence "are not prerequisites to a finding of exigency." *Id.*; accord *State v. Fausel*, 993 A.2d 455, 465 (Conn. 2010) ("Direct evidence of an emergency is not required . . . ."). The New York Court of Appeals came to a similar conclusion in *People v. Mitchell*, 347 N.E.2d 607 (N.Y. 1976), *abrogated as applied to Federal Constitution by Brigham City v. Stuart*, 547 U.S. 398 (2006). The *Mitchell* court created the three-part test that we later adopted in *Mountford*, 171 Vt. at 490-91, 769 A.2d at 644. The *Mitchell* court explicitly rejected the idea that "obvious signs which connect the place to be searched with the emergency, for example, screams or the odor of a decaying corpse" were needed to invoke the emergency aid exception, and the court held that the emergency aid exception applied in that case even though "no such apparent clues were found." 347 N.E.2d at 610.

¶ 28. The majority cites *Mountford* for the proposition that a lack of a response from the trooper's knocking "was insufficient to support a belief that anyone was inside the house or that there was an immediate need for medical attention." *Ante*, ¶ 17. That is, of course, true, but here the trooper's belief rested on much more than a lack of response. The trooper was responding to a 9-1-1 emergency call reporting a serious accident, and the reported victim could not be found. The trooper was sent to perform a welfare check to determine whether the accident victim had returned home and whether he was in need of medical attention. As discussed, these circumstances in themselves created a reasonable belief that a seriously injured person was in the house. A lack of response to the trooper's knocking is perfectly consistent with the reasonable belief that the accident victim may have returned home and may have been too injured to answer the door. At that point, the trooper was justified in entering the curtilage and looking through a window to see if an injured person was in the house. Cf. *United States v. Barone*, 330 F.2d 543, 545 (2d Cir. 1964) (upholding a warrantless search under the emergency aid exception when the "investigation . . . would have been incomplete

without finding out . . . whether anyone there might be in need of aid").[3]

¶ 29. Because the trooper did not need any additional evidence to carry out the limited search she performed, it is irrelevant whether the record established that the footprints in the snow were recent. The important thing is that the record did not establish a complete lack of footprints in the snow or anything else that would dissipate the reasonable belief that the trooper had when she arrived on the scene.

¶ 30. The only relevance the footprints could possibly have is to provide additional support for the trooper's reasonable belief that an injured person was in the home. The trial court made a factual finding that the trooper had seen "recent footprints leading to the basement door." The majority recognizes that our review of the trial court's factual findings is deferential. *Ante*, ¶ 7. Further, given that the State was the prevailing party below, we can only overturn the trial court's factual findings if, taking all of the evidence in the light most favorable to the State and excluding all modifying evidence, "there is no reasonable or credible evidence to support them." *State v. Rheaume*, 2005 VT 106, ¶ 6, 179 Vt. 39, 889 A.2d 711 (quotation omitted).

¶ 31. In light of this highly deferential standard, I cannot agree with the majority's conclusion that the trial court had "no evidence to support the finding that the footprints or entry into the residence were recent." *Ante*, ¶ 8. The existence of "footprints in the snow" is often cited as the preeminent illustration of how a reasonable inference can be made from circumstantial evidence: "when footprints are discovered after a recent snow, it is certain that some animated being has passed over the snow since it fell." *Commonwealth v. Webster*, 59 Mass. 295, 312 (1850); see also *Commonwealth v. Zehner Bros. Farm Prods.*, 70 Pa. D. & C.2d 501, 508 (Ct. Common Pleas 1972) (referring to this passage from *Webster* as "the most vivid and well-known illustration of circumstantial evidence"). Although the trooper might not have stated

---

[3] Some courts have held that in these circumstances an officer is even justified in entering someone's home to investigate a reported emergency. See, e.g., *Matthews*, 2003 ND 108, ¶ 20 (noting that various "jurisdictions have upheld a warrantless search in circumstances in which the presence of a person inside the searched dwelling was unknown at the time of entry"). We need not go that far here to hold that the trooper was justified in the limited search she performed from outside defendant's home.

how fresh the snow was, it seems to me that in a state like Vermont, where snowfall is a regular occurrence during the winter months, it is reasonable for a trooper to assume, without declaring, and especially in an emergency, that footprints in snow are either recent enough to bear following or not necessarily so old as to be irrelevant. Indeed, that this is obvious may have led the trooper not to state it directly in her testimony — most Vermonters simply take it for granted that, because it snows so often during the winter, footprints in the snow are not necessarily old. For that matter, even if footprints appear old, it is not uncommon for people to retrace and step into existing footprints in snow to avoid having to break new trail.

¶ 32. To the extent that there is any debate over the recentness of the footprints, "we should be deferential" to the trooper's evaluation of the situation in response to an emergency. *Mountford*, 171 Vt. at 493, 769 A.2d at 646; accord, e.g., *State v. Frankel*, 847 A.2d 561, 568 (N.J. 2004) ("[T]hose who must act in the heat of the moment do so without the luxury of time for calm reflection or sustained deliberation."). Here, it was reasonable for the trooper to expect that the footprints could lead to another door where an injured person could have entered — all consistent with the supposition that an injured accident victim, not found at the scene of a reported accident, could be inside his home. Police officers routinely make quick decisions based on the existence of footprints in snow, and courts have consistently upheld such actions. See, e.g., *People v. Clark*, 547 P.2d 267, 271 (Colo. App. 1975) (holding that when footprints in snow at recent crime scene led to apartment building where defendant lived, warrantless entry of home and search for boots was proper, as wetness of boots would be highly probative evidence in need of preservation).

¶ 33. This case is not the first time police officers have entered private property in response to a 9-1-1 call that later turned out not to have been an actual emergency, and other courts have routinely upheld such actions. See, e.g., *State v. Macelman*, 834 A.2d 322, 327 (N.H. 2003); *Frankel*, 847 A.2d at 576. In *Macelman*, the New Hampshire Supreme Court held that the emergency aid exception applied to police actions premised on far fewer facts indicating an emergency than the investigatory actions that occurred here. The apparent emergency in *Macelman* arose from an anonymous tip reporting that a car was behind the defendant's residence and looked as if it might go over an

embankment. When the officers arrived on the scene, their view of the vehicle was obstructed. The officers knocked on the defendant's front door, but received no response. They then entered the defendant's backyard and approached his vehicle to see if the vehicle's occupants needed any assistance. At this point, the officers saw smoke and other indications of marijuana use and arrested defendant. It turned out that the vehicle was on a flat part of the yard and had a fence between it and the embankment. Nevertheless, because the officers could not see that the vehicle was safe until they approached it, the court held that "under the 'emergency aid' exception to the warrant requirement the police were entitled to enter the property and to approach the car to confirm or dispel their reasonable belief that an emergency existed." 834 A.2d at 328. As the court noted, the requirement of a reasonable belief "is a lower standard than the probable cause required for an ordinary search or seizure." *Id.* at 326.

¶ 34. Similarly, in *Frankel*, a dispatcher received a 9-1-1 call from the defendant's house, but no one was on the line, and when the police called back they received a busy signal. An officer then went to the defendant's home to perform a welfare check. When the officer arrived, the defendant denied having made a 9-1-1 call. The officer observed that the defendant was nervous and that a lawn chair propped against a door might have been placed in such a way as to form an obstacle to someone trying to leave the house. Believing that the defendant might be hiding a victim in his house, the officer called for backup and entered the home without a warrant. There was no victim in the house, but the officer's limited search did reveal a number of marijuana plants and grow lights in plain view. The defendant filed a motion to suppress and argued that the officer's warrantless search violated his constitutional rights. The New Jersey Supreme Court affirmed the denial of the motion and held that the officer's actions fell under the emergency aid exception to the warrant requirement. 847 A.2d at 576. The court recognized that this was a "close case," and that "[t]he sanctity of one's home is among our most cherished rights," but nonetheless held that in these circumstances "the duty to preserve and protect life and the need to act decisively and promptly must outweigh the privacy interests of an individual." *Id.*; accord, e.g., *Mitchell*, 347 N.E.2d at 611 ("Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount

concerns for human life and the legitimate need of society to protect and preserve life.").

¶ 35. In summary, this case is about how far police officers can go in responding to recognized emergencies. In my view, the Arizona Supreme Court had it right when it noted that "we do not want to deter police officers from engaging in searches for persons in distress." *State v. Fisher*, 686 P.2d 750, 763 (Ariz. 1984). Many courts have gone further and have held that we cannot deter such conduct because there is a "general obligation of police officers to assist persons whom they reasonably believe are in distress." *Id.* at 760 (citing cases); accord, e.g., *Frankel*, 847 A.2d at 574 ("Courts are loath to second-guess decisions made in good faith with the intent of protecting life when the circumstances clearly reveal a legitimate emergency that will not abide delay."). Under the majority's limited interpretation of the emergency aid exception, police officers are now asked to ignore this general obligation and risk leaving injured people undiscovered rather than briefly and logically investigating the situation further. That is not the message that I would send to our law enforcement officers. For these reasons, I respectfully dissent.

¶ 36. I am authorized to state that Justice Burgess joins in this dissent.