2011 VT 96

**State of Vermont v. Michael Weisler**
**State of Vermont v. Raymond King**

[35 A.3d 970]

Nos. 10-040 & 10-067

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed September 16, 2011

*David W. Gartenstein*, Windham County Deputy State's Attorney, Brattleboro, for Plaintiff-Appellee.

*William A. Nelson*, Middlebury, for Defendant-Appellant King, and *Allison N. Fulcher* of *Martin & Associates*, Barre, for Defendant-Appellant Weisler.

¶ 1. **Burgess, J.** Defendants in these consolidated appeals contend the trial court erred in denying a motion to suppress evidence seized from a vehicle in which they were passengers. The trial court found that the vehicle's owner voluntarily consented to the search. Defendants contend: (1) the finding of voluntariness must be reviewed de novo on appeal; (2) the consent to search was not voluntary; and (3) the consent was tainted by the owner's unlawful de facto arrest. We agree that the finding of voluntariness is subject to de novo review, but conclude that the consent was neither involuntary nor tainted, and therefore affirm.

¶ 2. The facts may be summarized as follows. On the evening of September 15, 2009, a Vermont state trooper monitoring traffic on Interstate 91 observed a vehicle traveling northbound without its rear license plate illuminated. The officer stopped the vehicle and approached it on foot from the passenger side. The vehicle was occupied by three men, later identified as Timothy Stone, the driver and owner; defendant Michael Weisler, the front passenger; and defendant Raymond King, the rear passenger. The officer asked for Stone's license and registration, and inquired as to his travel plans. In the process, the officer observed what he believed to be "marijuana flakes" on Weisler's shirt. The officer asked Stone to exit the vehicle, frisked him, and ordered him to be seated in his cruiser while he ran Stone's license and registration, which revealed a prior drug arrest. The officer spoke with Stone for a few minutes, asking him about the drug arrest and how much marijuana he had in the car. Stone said there was none. The officer then left to speak with the remaining passengers while Stone remained seated in the cruiser.[1]

¶ 3. The officer asked for Weisler's identification, and was told that it was behind the seat. The officer thereupon asked Weisler to exit the vehicle. As Weisler reached under the seat, the officer observed on the floor a box of cellophane wrap and a clear baggie

---

[1] Although the trial court found that the record was unclear whether Stone was handcuffed at this time, defendants claimed in their opening brief that he was handcuffed. The State disagreed, and defendants ultimately conceded in their reply brief and at oral argument that he was not handcuffed until later, and then only for a brief period of three to four minutes.

of white powder consistent in the officer's opinion with cocaine. Based on this observation and concern for his own safety, the officer ordered the men out of the vehicle, drew his handgun, and loudly shouted commands at both Weisler and King to get down on the ground and not to move. Both men were handcuffed and searched. The officer agreed that Stone had an opportunity to observe these events from where he was seated in the cruiser, and the police videotape clearly captures both the audio of the encounter and a subsequent visual of the men in handcuffs being searched.

¶ 4. The officer subsequently returned to the cruiser, informed Stone that there was "a big bag of cocaine" in his car, assured him that none of the men were under arrest, and told him that he would like to search the car "with your consent."[2] A conversation ensued in which the officer twice repeated that Stone did not have to allow the search and read a form reiterating Stone's right to withhold consent. The officer also stated that he would "attempt[] to obtain a search warrant from a judge" if Stone did not allow the search. Stone acknowledged that he understood, gave the officer consent to search, and signed the consent form. The police then searched the vehicle, seizing a bag of white powder (which later tested positive for cocaine) along with straws and razor blades from the glove compartment.

¶ 5. All three men were charged with possession of cocaine. They filed a joint motion to suppress, asserting that Stone's exit order was unwarranted by any reasonable suspicion of wrongdoing, and that his subsequent consent to search was effectively coerced by the show of force against King and Weisler. Following a hearing in which only the investigating officer testified, the court issued a written ruling denying the motion. The court found that the exit order was supported by a reasonable suspicion of drug-related activity, and that Stone's consent to search was uncoerced and voluntary. Weisler and King entered conditional pleas of guilty and filed separate appeals, which we consolidated for review. Stone's case remains pending.

---

[2] Although the trial court made no findings on whether or when Stone was handcuffed, the parties agree that the videotape shows that the investigating officer placed Stone in handcuffs shortly after subduing Weisler and King, but removed them several minutes later, before the second interview with Stone in which he consented to the search.

I.

■ ■ ¶ 6. Defendants renew their claim that Stone's consent to the warrantless search of his vehicle was involuntary, and that all of the evidence seized therefrom must be excluded.[3] See *State v. Lussier*, 171 Vt. 19, 30, 757 A.2d 1017, 1025 (2000) (evidence obtained in violation of constitutional rights may not be admitted at trial); *State v. Badger*, 141 Vt. 430, 443, 450 A.2d 336, 344 (1982) (seizure of evidence pursuant to involuntary consent violates Fourth Amendment). Before turning to the merits of the claim, however, we address a threshold dispute between the parties as to the appropriate standard of review. Defendants maintain that the voluntariness of a consent to search is a question of "constitutional fact" or a "mixed question of law and fact" subject to independent or de novo review on appeal. In contrast, the State asserts that it is a question of fact and therefore subject to review solely for clear error, i.e., the court's finding must be upheld unless "there is no reasonable or credible evidence to support" it. *State v. Nault*, 2006 VT 42, ¶ 7, 180 Vt. 567, 908 A.2d 408 (mem.) (quotation omitted).

¶ 7. In considering this issue, we do not write on a blank slate. The same question arose in connection with consent to search in *State v. Sprague*, 2003 VT 20, ¶ 24, 175 Vt. 123, 824 A.2d 539, where we acknowledged a tendency to "routinely" invoke the "de novo" formula in reviewing motions to suppress while applying a "more deferential" standard to the court's actual decision, but did not resolve the issue on the record presented. In at least two decisions since *Sprague*, however, we have definitively endorsed the "two-step" approach discussed in *Sprague*, wherein the trial court's underlying findings of "historical fact" are reviewed for clear error, while the ultimate "legal" conclusion or "constitutional fact" as to whether the historical facts establish voluntariness is reviewed de novo. *Id.* ¶ 24; see *State v. Sole*, 2009 VT 24, ¶ 23, 185 Vt. 504, 974 A.2d 587 ("As with any appeal of a grant or denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusion de novo."); *State v. Stevens*, 2004 VT 23, ¶ 10, 176 Vt. 613, 848 A.2d 330 (mem.) ("[W]e will apply a clearly erroneous standard to the trial court's

---

[3] The State does not contest defendants' standing to assert the claim under the automatic standing rule of *State v. Wright*, 157 Vt. 653, 654, 596 A.2d 925, 926 (1991) (mem.).

underlying historical facts, while reviewing the ultimate legal conclusion . . . de novo." (quotation omitted)).

¶ 8. While thus seemingly settled, the standard-of-review issue nevertheless conceals layers of complexity largely unexamined in our earlier decisions. Indeed, our approach to date has been somewhat more reflexive than reflective, relying on the characterization of questions as "factual" or "legal" or a "mixed question" of law and fact without significant attention to the reasons for deferential or independent review in a particular context. Lack of clarity on the topic is not unique to this jurisdiction. The U.S. Supreme Court has itself acknowledged that "the appropriate methodology for distinguishing questions of fact from questions of law has been, to say the least, elusive," and that it has "not charted an entirely clear course in this area." *Miller v. Fenton*, 474 U.S. 104, 113 (1985); see also *Thompson v. Keohane*, 516 U.S. 99, 110-11 (1995) (observing that "the proper characterization of a question as one of fact or law is sometimes slippery"); see generally H. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229, 267 (1985) (noting the "erratic and uncertain" state of the law governing standard of review and the fact/law distinction).

¶ 9. As we recognized in *Sprague*, 2003 VT 20, ¶ 24, most federal courts have applied a clearly erroneous standard to the voluntary-consent issue, although the decisions are not monolithic. Compare, e.g., *United States v. Silva-Arzeta*, 602 F.3d 1208, 1213 (10th Cir. 2010) ("Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances and reviewed for clear error." (quotation omitted)), and *United States v. Tompkins*, 130 F.3d 117, 120 (5th Cir. 1997) (reaffirming rule that "the voluntariness of a detainee's consent to a warrantless search is a finding of fact to be reviewed for clear error"), with *United States v. Wade*, 400 F.3d 1019, 1021 (7th Cir. 2005) (stating that "[q]uestions of law — that is, the legal conclusion of whether [the defendant's] consent [to search] was voluntary and whether he was illegally seized — are reviewed de novo."), and *Michael C. v. Gresbach*, 479 F. Supp. 2d 914, 920 (E.D. Wis. 2007) ("Because voluntariness is determined based on a reasonable person standard, it is treated as a question of law.").

¶ 10. At the same time, many state courts have adopted the two-step approach set forth in *Sprague*, deferring to the trial court's underlying findings of historical fact while independently deciding as a matter of law whether they ultimately demonstrate

that the defendant's consent was voluntary and not the product of police duress or coercion. See, e.g., *Woods v. State*, 890 So. 2d 559, 561 (Fla. Dist. Ct. App. 2005) (holding that consent to search is a "[m]ixed question[] of law and fact . . . reviewed by appellate courts using a two-step approach, deferring to the trial court on questions of historical fact" while "its determination of whether a defendant's conduct was objectively voluntary, is de novo"); *State v. Nadeau*, 2010 ME 71, ¶ 18, 1 A.3d 445 ("A court's factual findings addressing the existence of consent are reviewed for clear error. The ultimate question of whether the facts, as found, establish that an individual consented to the ensuing search and seizure is a distinctly legal question that we will review de novo." (citation omitted)); *State v. Wilson*, 367 A.2d 1223, 1231 (Md. 1977) ("On appeal, we examine the entire record and make an independent determination of the ultimate issue of voluntariness."); *State v. Bea*, 864 P.2d 854, 860 (Or. 1993) ("In reviewing the voluntariness of a defendant's consent to search, this court will not disturb the trial court's findings of historical fact if evidence supports them; this court is not, however, bound by the trial court's ultimate holding as to voluntariness, but assesses anew whether the facts suffice to meet constitutional standards." (quotation omitted)); *State v. Shelton*, 990 A.2d 191, 199 (R.I. 2010) (reaffirming rule that reviewing court "defer[s] to the factual findings of the trial justice, applying a clearly erroneous standard" but "the determination of the voluntariness of an individual's consent to search is reviewed by this Court *de novo*" (quotation and citation omitted)); *State v. Thurman*, 846 P.2d 1256, 1271 (Utah 1993) (holding that while trial court's "underlying factual findings will not be set aside unless . . . clearly erroneous," appellate court "view[s] the ultimate conclusion that consent [to search] was voluntary or involuntary as a question of law, reviewable for correctness"); *State v. Phillips*, 577 N.W.2d 794, 800 (Wis. 1998) (holding that, in reviewing whether a defendant voluntarily consented to a search, "[w]e are permitted to independently determine from the facts as found by the trial court whether any time-honored constitutional principles were offended" (quotation omitted)).

¶ 11. As so often with the law, tracing the source of a rule can yield unexpected insights. One leading criminal-law commentator notes that the clearly erroneous standard is most often "attributed to the Supreme Court's assertion in *Schneckloth v. Bustamante*,

[412 U.S. 218, 227 (1973),] that 'the question whether a consent to search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.' " 6 W. LaFave, Search and Seizure § 11.7(c), at 449 (4th ed. 2004). *Schneckloth*, however, said nothing specifically about the appropriate standard of appellate review. See *United States v. Navarro*, 90 F.3d 1245, 1256 n.6 (7th Cir. 1996) (noting that "[a]lthough *Schneckloth* terms the issue of consent an issue of fact to be determined from all the circumstances, it does not speak directly to the standard of appellate review."). The statement in *Schneckloth* was made in the course of exploring the question of "what must the prosecution prove to demonstrate that a consent [to search] was 'voluntarily' given," 412 U.S. at 223, and the bulk of the Court's discussion was given to reviewing and adopting the test governing the voluntariness of confessions, where the Court had long held that judges should assess "the totality of all the surrounding circumstances — both the characteristics of the accused and the details of the interrogation." *Id.* at 226; see generally Comment, *Voluntariness of Consent to Search*, 87 Harv. L. Rev. 213, 215 (1973) (observing that the Court's analysis in *Schneckloth* led it "to conclude that the voluntariness of a confession is a question of fact which has always involved a consideration of all the surrounding circumstances").

■ ¶ 12. Context here is critical, because the standard of review governing the voluntariness of confessions — at the time of *Schneckloth* and since — is generally de novo. See *Miller*, 474 U.S. at 115 (declining "to abandon the Court's longstanding position" that the ultimate question of voluntariness of a confession "is a legal question meriting independent consideration"); *Davis v. North Carolina*, 384 U.S. 737, 741-42 (1966) ("It is our duty in this case, however, as in all of our prior cases dealing with the question whether a confession was involuntarily given, to examine the entire record and make an independent determination of the ultimate issue of voluntariness."); *Tompkins*, 130 F.3d at 120 n.10 (noting that the "ultimate issue" concerning the voluntariness of confessions "is uniformly held to be subject to *de novo* review"). Clearly, the high court perceived no inconsistency in deeming the voluntariness of a confession to be a highly contextual, fact-specific inquiry in the first instance subject, nevertheless, to independent review on appeal. Simply labeling con-

sent to search as a question of fact to be determined from the totality of the circumstances, therefore, does little to advance the standard-of-review analysis. See *Thompson*, 516 U.S. at 112 n.11 (observing that, contrary to the respondents' suggestion, "[t]he 'totality of the circumstances' cast of the 'in custody' determination . . . does not mean deferential review is in order.").[4]

¶ 13. More recent Supreme Court decisions, starting with *Miller v. Fenton*, offer additional guidance. There, the high court specifically rejected the government's claim that the "case-specific" nature of the "voluntariness" inquiry undermined any basis for independent review of confessions in habeas proceedings. 474 U.S. at 113.[5] In so holding, the Court readily acknowledged that the voluntariness question did not lose its "factual character" merely because it involved "an inquiry into state of mind" or "because its resolution is dispositive of the ultimate constitutional question." *Id.* Eschewing reliance on labels, the Court candidly explained that, "[a]t least in those instances in which . . . the issue falls somewhere between a pristine legal standard and a simple historical fact," deciding the appropriate standard of review pivots on the basic "determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Id.* at 114.

¶ 14. The Court proceeded to explain that determining whether, in a given case, a suspect's consent was given voluntarily and in compliance with due process implicates a "complex of values . . . [that] militates against treating the question as one of simple historical fact." *Id.* at 116 (quotation and citation omitted). Moreover, as the high court later explained in *Bose Corp. v Consumers Union of United States, Inc.*, "the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge." 466 U.S. 485, 501 (1984). Thus, regardless of whether the trial

---

[4] Our own confession cases are similarly erratic, occasionally stating that we review for clear error, see, e.g., *State v Beckley*, 157 Vt. 446, 450, 600 A.2d 294, 296 (1991), while recognizing the need for an independent determination of the ultimate issue of voluntariness, *In re Robinson*, 161 Vt. 550, 554, 641 A.2d 779, 781 (1994).

[5] Although *Miller* involved federal habeas review of a state decision, the Court has since applied the independent review standard to confessions on direct appeal. See, e.g., *Arizona v Fulminante*, 499 U.S. 279, 287 (1991).

court alone determines the voluntariness of a confession or, as in Vermont, the trial court makes the initial determination and subsequently submits the issue to the jury to decide "whether to rely on the confession," *State v. Caron*, 155 Vt. 492, 503, 586 A.2d 1127, 1133 (1990), the Supreme Court views the ultimate question of voluntariness to be a matter for independent review on appeal. See *Muehler v. Mena*, 544 U.S. 93, 98 n.1 (2005) (reaffirming rule that, in determining whether a Fourth Amendment violation occurred, "as we made clear in *Ornelas v. United States*, 517 U. S. 690 . . . (1996), we do not defer to the jury's legal conclusion"); *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001) (holding that constitutionality of jury's punitive damage award is subject to de novo review).

■ ■ ¶ 15. The Supreme Court subsequently refined its functional approach to standard-of-review issues in a pair of seminal criminal-procedure rulings, *Thompson v. Keohane* and *Ornelas*. In *Thompson*, the Court held that the question of whether a suspect is "in custody" and therefore entitled to *Miranda* warnings was "a mixed question of law and fact qualifying for independent review." 516 U.S. at 102. In *Ornelas*, the question was whether findings of reasonable suspicion to stop and probable cause to conduct a warrantless search "should be reviewed 'deferentially,' and for 'clear error.'" 517 U.S. at 691. The Court ruled that they should be reviewed de novo. *Id.*

¶ 16. Instructively, the Court applied similar factors and reasoning in reaching its conclusion in both cases. First, the Court noted that "objective" factors inform both decisions. In resolving the in-custody issue, the question is "what were the circumstances surrounding the interrogation" and "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112. In *Ornelas*, the Court observed that once the historical facts are established, the decision turns on "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." 517 U.S. at 696. Thus, assessments of demeanor and credibility — the traditional province of the trial judge — while relevant to establishing the underlying facts were not central to the crucial evaluation as to whether those facts meet the objective test of reasonableness in either case. *Id.* at 696-97; *Thompson*, 516 U.S. at 113-15.

¶ 17. In addition, the Court found that independent review by appellate courts provides useful precedents to "guide future decisions" as well as to "guide police, unify precedent, and stabilize the law." *Thompson*, 516 U.S. at 114-15. Indeed, the very fact-specific nature of the inquiry, the Court observed in *Ornelas*, underscores the importance of independent review. "[T]he legal rules for probable cause and reasonable suspicion acquire content only through application," the Court explained; thus, de novo review offers the greater opportunity to "unify precedent" and provide law enforcement officers with guidelines "to reach a correct determination beforehand." *Ornelas*, 517 U.S. at 697 (quotation omitted). These considerations, together with the Court's fundamental reluctance to cede Fourth Amendment juris-prudence to the rulings of "different trial judges draw[ing] general conclusions that the facts are sufficient or insufficient" to meet the reasonableness standard, led it to reject the policy of "sweeping deference" advocated by the government. *Id.* (quotation omitted).

¶ 18. Any number of courts have since looked to the principles articulated in *Miller*, *Thompson*, and *Ornelas* to determine the appropriate standard of review of other issues, including the voluntariness of a consent to search. Many have concluded that these principles militate in favor of independent review. *State v. Thurman*, 846 P.2d 1256 (Utah 1993), is illustrative. There, the Utah Supreme Court reasoned that the "two-step" approach to consent to search most closely approximates "the relative func-tions of the trial and appellate courts while ensuring the consis-tent and uniform protection of a fundamental civil liberty." *Id.* at 1271. Application of the clearly erroneous standard to the under-lying factual findings "recognizes the trial court's advantaged position in judging credibility and resolving evidentiary conflicts" while application of the de novo standard to the "ultimate voluntariness determination acknowledges" the traditional role of appellate judges in giving content to that inquiry. *Id.* The Utah court's reasoning echoes that of the high court, and is worth consideration in full:

> [T]he concept of "voluntariness" reflects a balance be-tween the need for effective law enforcement and soci-ety's belief that the coercive powers of law enforcement must not be unfairly exercised. Declaring whether certain police conduct is or is not unfairly coercive sets the norms that fix the limits of acceptable police behavior.

There can be little question that establishing such norms involves substantive policy judgments and that such norms should have jurisdiction-wide application. These are functions classically reserved to multi-judge appellate panels. In short, what constitutes unfairly coercive police behavior should not vary from courtroom to courtroom within Utah. This end is best accomplished by viewing the ultimate conclusion that consent was voluntary or involuntary as a question of law, reviewable for correctness.

*Id.* (citations omitted).

¶ 19. The Wisconsin Supreme Court also engaged in a thoughtful analysis of the issue in *State v. Phillips*, 577 N.W.2d 794 (Wis. 1998). The *Phillips* court addressed the state's request to overrule its earlier holding in *State v. Turner*, 401 N.W.2d 827, 833 (Wis. 1987), that voluntariness of consent to search is reviewed independently on appeal. The state cited the federal decisions predicated on *Schneckloth*'s characterization of the issue as one of fact to be determined from the totality of the circumstances. *Phillips*, 577 N.W.2d at 800. The Wisconsin court, however, rejected the proposition that standard of review "turn[s] on whether the underlying determination of the [trial] court was fact-specific." *Id.* Instead, like the U.S. Supreme Court in *Miller* and *Ornelas*, the court reasoned that "the principal reason for independent appellate review . . . is to provide uniformity in constitutional decision-making" on matters that reflect "the basic value commitments of our society." *Id.* at 800-01. "In applying the skeletal constitutional rule," the court continued, "appellate courts flesh out the rule and provide guidance to litigants, lawyers, and trial and appellate courts." *Id.* at 801 (quotation omitted). The court thus concluded that it would continue to treat voluntariness of consent as an issue of "constitutional fact" subject to independent review on appeal. *Id.*

¶ 20. As noted, other courts have reached similar conclusions, for similar reasons. See, e.g., *Phuagnong v. State*, 714 So. 2d 527, 529-30 (Fla. Dist. Ct. App. 1998) (relying on high court decisions in *Miller* and *Ornelas* to hold that "[t]he same reasoning supports independent appellate review where the validity of a search has been found to rest . . . on consent"); *Nadeau*, 2010 ME 71, ¶ 18 (holding that voluntariness of consent to search presents an

"analogous" issue to voluntariness of a confession and .thus, as in *Miller*, presents a "legal question that we will review de novo"); *Turner v. State*, 754 A.2d 1074, 1080 (Md. Ct. Spec. App. 2000) (relying on *Ornelas* to hold that consent to search implicates a "constitutionally protected right" requiring independent review (quotation omitted)); *State v. Stevens*, 806 P.2d 92, 103 (Or. 1991) (relying on its holding in *State v. Warner*, 585 P.2d 681, 686 (Or. 1978), that a reviewing court has a "duty to interpret constitutional standards and require conformance thereto" and concluding that, as to voluntariness of consent to search, reviewing court must "assess anew whether the facts suffice to meet constitutional standards"); *Shelton*, 990 A.2d at 199 (relying on *Ornelas* to hold that "the voluntariness of an individual's consent to search is reviewed by this Court de novo").

¶ 21. Still, a number of courts, for reasons not always clear, continue to apply the clearly erroneous standard to consent to search. Although rarely discussed in the case law, objections to independent review appear to focus on several points. First is the matter of judicial resources, i.e., the concern that de novo review is "redundant and wasteful" and might serve to encourage frivolous appeals. *Thurman*, 846 P.2d at 1271; see also F. Strong, *The Persistent Doctrine of "Constitutional Fact"*, 46 N.C. L. Rev. 223, 281 (1968) (expressing concern over the potential proliferation of cases requiring independent review); A. Hoffman, Note, *Corralling Constitutional Fact: De Novo Fact Review in the Federal Appellate Courts*, 50 Duke L.J. 1427, 1459 (2001) (citing the worry that an "overly expansive constitutional fact doctrine would . . . overwhelm" the appellate docket). As the court in *Thurman* observed, however, the argument proves too much; it could be applied to any issue of law subject to de novo review, and thus provides no real "reason in itself to adopt the clearly erroneous standard." 846 P.2d at 1271; see also M. Rosenberg, *Appellate Review of Trial Court Discretion*, 79 F.R.D. 173, 181 (1978) (rejecting preservation of judicial resources as a persuasive reason for appellate deference because "it is non-discriminating [and] could apply to any and every question"). The concern for preserving appellate resources is even less persuasive in states like Vermont, where appeal from a criminal conviction is "as of right" to the Supreme Court.

¶ 22. Another related concern expressed by some commentators is the need to define "effective limiting principle[s] for when

constitutional fact review should be applied," so that every issue with a constitutional dimension does not necessarily acquire de novo status. Hoffman, *supra*, 50 Duke L.J. at 1434; see also Monaghan, *supra*, 85 Colum. L. Rev. at 264 (citing the "extraordinary variety of contexts" in which the issue may arise). The concern is a real one, but it has been addressed. As noted, beginning with *Miller* the high court has articulated and applied a reasonably coherent standard-of-review jurisprudence, focusing on the respective competencies of trial and appellate courts to resolve the issue, the need for precedential decisions to guide police and judicial decisionmakers, and the nature and relative importance of the values underlying the constitutional claim. Moreover, while the high court has extended independent review to a number of additional areas, see, e.g., *United States v. Bajakajian*, 524 U.S. 321, 337 n.10 (1998) (review of Eighth Amendment claim subject to de novo review), it has also had no difficulty holding some issues to be more appropriate for deferential review. See *Thompson*, 516 U.S. at 111 (reaffirming its earlier decisions in *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam), and *Wainwright v. Witt*, 469 U.S. 412, 429 (1985), that issues of competency to stand trial and juror impartiality, respectively, "depend[] heavily on the trial court's appraisal of witness credibility and demeanor" and therefore warrant deferential review); *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) (stating that the Court was "not inclined to disagree with [state court's] fact-specific" decision as to whether exigent circumstances to prevent either escape or destruction of evidence justified warrantless entry); see also *State v. Byrge*, 2000 WI 101, ¶¶ 43-44, 614 N.W.2d 477 (applying high court's holdings in *Miller* and *Thompson* to conclude that the ultimate resolution of defendant's competency to stand trial rests on trial court's observations of witness credibility and demeanor and therefore is subject to clearly erroneous standard).

¶ 23. Finally, there is the argument from authority. This generally takes two forms. Those courts that continue to apply a clearly erroneous standard do so largely on the basis of longstanding precedent — precedent that relies, in turn, on *Schneckloth*'s characterization of the question as one of fact comparable to confessions. See e.g., *Navarro*, 90 F.3d at 1256 (concluding on the basis of *Schneckloth* that the court would "review the question of voluntariness . . . for clear error because

it is a question of fact to be determined from the totality of the circumstances" (quotation and citation omitted)). As we have seen, however, the voluntariness of a confession "is uniformly held to be subject to *de novo* review." *Tompkins*, 130 F.3d at 121 n.10. Thus, any logical coherence in grounding deferential review of consent to search on *Schneckloth*'s characterization of the question as one of fact is illusory.

¶ 24. A few courts have gone further and determined not to depart from the clearly erroneous standard on the strength of the Supreme Court's reaffirmation of *Schneckloth* in *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). See, e.g., *Tompkins*, 130 F.3d at 120 ("The *Robinette* Court noted that voluntariness of consent to search is a question of fact; as such, it does not trigger the *de novo* review mandated by the Supreme Court in *Ornelas*."); *State v. Southern*, No. 00CA2541, 2000 WL 33226310, at *3 (Ohio Ct. App. Dec. 28, 2000) (concluding that it was "duty bound to follow" *Robinette* in determining whether trial court's finding on voluntariness of consent to search was against manifest weight of the evidence). The difficulty here is that *Robinette* was no more concerned with standard of review than *Schneckloth*. The question was whether a consent to search should be considered involuntary "per se" where the police fail to inform the suspect that he or she is free to go, and the Court simply reaffirmed its holding in *Schneckloth* that the question is not susceptible to "bright-line" rules but turns on all the circumstances surrounding the encounter. 519 U.S. at 39-40. Thus, *Robinette* is no more persuasive on the issue than *Schneckloth*.

■ ¶ 25. With this background in mind, we are persuaded that the reasoning of those courts that have adopted independent review in this setting is fundamentally sound, and that any objections are without merit.[6] As with the facts surrounding a

---

[6] Our conclusion is based on the persuasive principles articulated by the Supreme Court and applied by a number of state courts, as discussed above. Therefore, we note, but need not resolve, the ongoing debate among courts and commentators as to whether the principles articulated by the Supreme Court concerning the standard of review for Fourth Amendment-related issues are actually binding on the states. See generally R. Coombs, *A Third Parallel Primrose Path: The Supreme Court's Repeated, Unexplained, and Still Growing Regulation of State Courts' Criminal Appeals*, 2005 Mich. St. L. Rev. 541, 551-52 (discussing the substantial confusion among state appellate courts as to whether they are bound to apply the Supreme Court's de novo review decisions because the Court "has not

confession, the voluntariness of a consent to search focuses on a variety of objective factors relating to the suspect's age, mental ability, and experience and the environment in which the consent was obtained, including the location and length of the stop, the use of physical restraint, threats or intimidation, and whether the suspect was informed of his or her right to withhold consent. See *United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010) (enumerating factors relevant to voluntariness analysis); *Sprague*, 2003 VT 20, ¶¶ 28-29 (concluding that consent was not voluntary based on certain "inherently coercive" factors including defendant's initial seizure, officer's "show of authority," the location of the stop, and the absence of warnings that defendant could refuse consent). The ultimate question is whether "a reasonable person in defendant's circumstances" would have felt free to refuse the officer's request. *Sprague*, 2003 VT 20, ¶ 28. Thus, once the underlying historical facts are determined, issues of credibility and demeanor (the province of the trial court) are not central to the ultimate decision. See *Thompson*, 516 U.S. at 113 (observing that "[c]redibility determinations, as in the case of the alleged involuntariness of a confession, . . . may sometimes contribute to the establishment of the historical facts" but the "crucial question entails an evaluation made after determination of those circumstances" as to how a "reasonable person" would have understood the situation).

¶ 26. At the same time, as the Supreme Court stressed in *Ornelas*, the "multi-faceted" nature of the voluntariness inquiry underscores the need for a body of binding case-law applying the consent-standard in a variety of individual cases, thereby providing "content . . . through application" and guidance to the police and the trial courts. 517 U.S. at 697; see also *Miller*, 474 U.S. at 114 (citing the imperative for independent review where "the relevant legal principle can be given meaning only through its application to the particular circumstances of a case"). Finally, we recognize that the voluntariness-of-consent issue implicates a "complex of values," *Miller*, 474 U.S. at 116 (quotation omitted); it requires a balancing of the need for effective law enforcement against the imperative to restrain unfair police tactics and main-

---

yet expressly stated, nor otherwise eliminated substantial doubt, . . . in whole or part [that] such review is constitutional doctrine and thus binding on both federal and state appellate courts").

tain individual dignity — a declaration of constitutional norms and values that demands statewide force and application. These are functions that only a reviewing court with broad jurisdiction and authority can perform. Accordingly, we hold that a trial court's decision on the question of the voluntariness of a consent to search, and thus the ultimate constitutional validity of the search, must be reviewed independently by this Court on appeal.

¶ 27. Although our dissenting colleague objects to this holding on several grounds, none proves persuasive. The dissent expresses initial concern about "the breadth of the majority holding," observing that "the issues underlying a motion to suppress can be very different." *Post,* ¶¶ 47, 48. We quite agree, which is why our analysis is focused exclusively on consent to search, and our holding is limited to that issue. The concern for overbreadth is unfounded.

¶ 28. Equally baseless is the dissent's suggestion that our holding represents a departure from past practice based on a misguided desire to "fix" what is not broken. *Post,* ¶ 51. On the contrary, as explained at the beginning of this opinion, the law in this area (our own included) is strikingly unsettled and inconsistent, and warrants the fresh review in the preceding discussion. Nor does our holding break new ground. While we acknowledge the split of authority on the question presented, we ultimately rely on the reasoning in numerous state court decisions that the voluntariness of a suspect's consent to search must be examined independently by a reviewing court.

¶ 29. Turning to issues of substance, the dissent questions the relevance of the trilogy of Supreme Court decisions — *Miller, Thompson,* and *Ornelas* — that inform our analysis. If these cases are indeed inapposite then we can only conclude that the numerous courts and commentators that have relied on them for similar guidance must be equally misinformed. That is not, however, the case. While it was decided as a habeas matter, *Thompson's* analysis of the respective roles of trial and appellate courts has been usefully applied beyond the habeas context, to hold, for example, that "in custody" determinations for *Miranda* purposes must be reviewed de novo in direct appeals. See, e.g., *United States v. LeBrun,* 363 F.3d 715, 719 (8th Cir. 2004) ("It seems clear to us that *Thompson's* rationale requires that on direct appeal we review the district court's custody determination de novo."); *State v. Smith,* 38 P.3d 1149, 1153 (Alaska 2002)

("[W]e . . . adopt *Thompson*'s rationale and apply *de novo* review to the ultimate *Miranda* custody determination on direct appeal."); *State v. Oney*, 2009 VT 116, ¶ 13 n.6, 187 Vt. 56, 989 A.2d 995 (relying on *Thompson* to hold that "in custody" determination is "subject to independent review"). *Thompson* has also been cited as instructive in other fact/law contexts, including issues of voluntariness. See P. Rutledge, Comment, *The Standard of Review for the Voluntariness of a Confession on Direct Appeal in Federal Court*, 63 U. Chi. L. Rev. 1311, 1335 (1996) ("Under the *Thompson* conception of the mixed question analysis, an appellate court should review the voluntariness determination de novo.").

¶ 30. The dissent's critique of *Ornelas* is weaker still, resting on a claim that we have ignored or rejected that portion of the Supreme Court's opinion reaffirming the traditional deference afforded trial court findings of historical fact. *Ornelas*'s significance, however, was its seminal holding — later specifically reaffirmed in *United States v. Arvizu*, 534 U.S. 266 (2002) — that the standard of appellate review for reasonable-suspicion determinations must be de novo in order "to unify precedent[,] . . . provide law enforcement officers with the tools to reach correct determinations beforehand," and "add to the body of law on the subject." *Id.* at 275 (citing and quoting *Ornelas*, 517 U.S. at 697-98)). As previously discussed, but largely ignored by the dissent, the high court's analysis and holding in *Ornelas* have been applied by courts in other areas, including consent searches.

¶ 31. The third and arguably most compelling leg of our analysis, *Miller v. Fenton*, the dissent dismisses as yet another habeas case. As explained, however, the Supreme Court expressly extended its holding in *Miller* to direct appeals in *Fulminante*, 499 U.S. at 287 (holding that "the ultimate issue of 'voluntariness' is a legal question" requiring independent review (quoting *Miller*, 474 U.S. at 110)). More important, the dissent overlooks the body of case law — previously discussed — that has relied on *Miller* to conclude that the voluntariness of a consent search must be reviewed de novo on appeal.

¶ 32. The dissent further claims that the "most important" distinction between this case and the Supreme Court decisions is that the voluntariness inquiry here implicates a "subjective" standard requiring a determination of the defendant's state of mind, an inquiry that turns principally on issues of fact. *Post*, ¶¶

61, 64. The argument is demonstrably incorrect. This and other courts have repeatedly recognized that the fundamental inquiry in the consent-to-search context is whether "a *reasonable person* in defendant's circumstances would . . . have felt free to refuse." *Sprague*, 2003 VT 20, ¶ 28 (emphasis added); see also *Stevens*, 2004 VT 23, ¶ 16 (mem.) (applying "reasonable person" standard to hold that atmosphere was not so inherently coercive as to prevent voluntary consent to search). As noted, decisions far too numerous to cite in toto apply the identical standard. See, e.g., *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007) ("The central question in determining whether consent to a search is voluntary is 'whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' request' " (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)); *United States v. Butler*, 102 F.3d 1191, 1197 (11th Cir. 1997) (observing that decision on whether consent to search was voluntary requires consideration of whether " 'the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's request' " (quoting *Bostick*, 501 U.S. at 439)); *State v. Bell*, 557 N.W.2d 603, 607 (Minn. Ct. App. 1996) (determining whether consent to search was voluntary "requires the court to ask whether a reasonable person would have felt free to refuse the officer's request"); *State v. Cromer*, 186 S.W.3d 333, 347 (Mo. Ct. App. 2005) (in determining whether consent to search was voluntary, court must "determine whether the police conduct would have . . . communicated to a reasonable person that the person was not free to decline the officers' requests" (quotation omitted)); *State v. Jones*, 932 N.E.2d 904, 917 (Ohio Ct. App. 2010) (determining whether consent to search was freely given requires "an objective test, and the proper inquiry is whether a reasonable person would feel free to decline the officers' requests" (quotation omitted)).

■■■ ¶ 33. The voluntariness inquiry may include an appraisal of such personal attributes as the suspect's age, education, maturity, and intelligence. *Fulminante*, 499 U.S. at 286 n.2; *Schneckloth*, 412 U.S. at 226. Nevertheless, the inquiry remains an objective one, focused on whether a reasonable person in the defendant's circumstances would have retained the freedom of will to withhold consent, not whether the specific defendant's subjective will was overborne. See *Commonwealth v. Strickler*, 757 A.2d 884, 901 (Pa. 2000) (observing that, "although the [voluntariness] inquiry is an

objective one, the maturity, sophistication and mental or emotional state" of the defendant may be taken into account). Thus, as noted, appellate courts have traditionally reviewed and resolved independently the question of voluntariness in order to "guide police, unify precedent, and stabilize the law." *Thompson*, 516 U.S. at 115; see also *Strickler*, 757 A.2d at 901 (observing that the test for voluntariness "centrally entail[s] an examination of the objective circumstances surrounding the police/citizen encounter" to determine the "impact upon a reasonable citizen-subject's perspective").

¶ 34. Ultimately, it is not the purported distinctions from *Ornelas, Thompson,* and *Miller* that appear to drive the dissent but rather a fundamental disagreement with their holdings, a disagreement grounded on a suspicion that de novo review somehow represents a "negative assessment of the quality of fact-finding by trial courts with respect to federal constitutional questions." *Post,* ¶ 76. This inference is unfounded and can not be reached by anything stated or implied in the majority opinion. Like the U.S. Supreme Court, we continue to accord substantial deference to the trial court's findings of historical fact. Nothing in our opinion can or should be construed to undermine this fundamental principle of appellate review.

## II.

¶ 35. Turning to the particular facts and circumstances presented, our independent review of the record leads us to conclude that Stone's consent to search was voluntary. Defendants' appeal focuses on two principal points. First, they contend the trial court disregarded a critical circumstance that allegedly rendered the environment inherently coercive, to wit, Stone's observation from the police cruiser of defendants' being forced to the ground at gunpoint, handcuffed, and patted down.[7] The trial court found in this regard that "n[o] evidence was presented at the evidentiary hearing to substantiate that this is why Stone gave consent to search his vehicle or that he considered this in any way," and the court declined to "speculate" that "this set of circumstances is what caused Stone to give consent to search the vehicle." As we

---

[7] Stone was also handcuffed at one point during the episode, but defendants have conceded that the handcuffs were removed before the conversation with the officer in which he gave consent to search.

have explained, however, the question here is not what subjectively motivated Stone to give consent, but whether a reasonable person in his position would have felt so threatened by the armed subjugation of his colleagues that any subsequent consent to search could not be freely given. *Sprague*, 2003 VT 20, ¶ 28.[8]

■ ¶ 36. Viewing the officer with his gun drawn outside of the police cruiser might have seemed intimidating to Stone, sitting inside of the cruiser. Nevertheless, we are persuaded by all of the surrounding facts and circumstances that his consent to search was voluntary. Display of a weapon, shouting, and forcibly subduing or handcuffing a suspect does not per se vitiate a subsequent consent to search that the record otherwise shows to be uncoerced and freely given. See, e.g., *United States v. Brown*, 563 F.3d 410, 413, 416 (9th Cir. 2009) (upholding consent to search after suspect was initially ordered to ground at gunpoint, handcuffed, and patted down); *United States v. Jones*, 523 F.3d 31, 38 (1st Cir. 2008) (rejecting claim that circumstances of consent to search were "inherently coercive" where it was preceded by officers' forcible entry with guns drawn and defendant was handcuffed and removed to separate room); *United States v. Kimoana*, 383 F.3d 1215, 1226 (10th Cir. 2004) (although officers entered room with guns drawn and raised voices, subsequent consent to search was voluntary where guns were holstered and "calm" had been restored); *State v. Sokolowski*, 474 S.E.2d 333, 336 (N.C. 1996) (upholding consent to search from suspect earlier disarmed at gunpoint, *Mirandized*, and in custody); *Sole*, 2009 VT 24, ¶ 24 (observing that "it is settled that consent may be properly deemed voluntary even when a suspect is handcuffed and under arrest").

■ ¶ 37. Stone's observation of the officers' display of force may have been unsettling, but it was not specifically directed at him, and there was nothing about the encounter to suggest that Stone's capacity to reason should have been unhinged or his

---

[8] Defendants also summarily assert that the trial court's statements, quoted above, indicate that the court impermissibly shifted the burden of proof on the voluntariness of consent to defendants. See *State v. Pitts*, 2009 VT 51, ¶ 24, 186 Vt. 71, 978 A.2d 14 (noting that State carries burden of demonstrating that consent was freely given and not coerced). The court's statements do not, however, suggest either that it misunderstood the burden of proof — which it accurately described as resting with the State — or that it impermissibly shifted the burden to defendants.

ability to consent overborne. See *United States v. Taylor*, 31 F.3d 459, 464 (7th Cir. 1994) (observing that, "[t]hough certainly unpleasant," officers' forced entry at gunpoint, display of weapons and badges, and forcible restraint of defendant were "commonly used" tactics to protect officer safety and did not vitiate voluntariness of subsequent consent). The conversation leading to Stone's consent occurred about five minutes after the incident, in the trooper's vehicle and in an atmosphere of relative calm. In that discussion, the officer assured Stone several times in a level and conversational tone that he was not required to consent to a search of his car. He stated, "I want to make it abundantly clear to you that you don't have to allow this." Although we have held that the police are not required to advise a suspect of his or her right to withhold consent, the giving of such advice supports the conclusion that the consent was voluntary. *Sprague*, 2003 VT 20, ¶ 29; see also *United States v. Mendenhall*, 446 U.S. 544, 558-59 (1980) (although Constitution did not require it, fact that suspect was twice informed of her right to withhold consent to search "was highly relevant to the determination that there had been consent"). Stone also signed a consent-to-search form, which — while not dispositive — also supports a finding of voluntariness. See *Taylor*, 31 F.3d at 463 (fact that suspect signed consent-to-search form "weighs heavily toward finding that his consent was valid").

¶ 38. It is true that the officer also cautioned Stone that a refusal to give consent would result in the officer's "attempting to obtain a search warrant from a judge." We have explained, however, that statements indicating an intent by the police to apply for a warrant merely "describe what will occur in the event of a refusal" and do not undermine a subsequent consent to search. *State v. Pitts*, 2009 VT 51, ¶ 30, 186 Vt. 71, 978 A.2d 14. Nor, contrary to defendants' assertion, do the additional circumstances that Stone expressed a desire to get back to his young daughter, that the stop occurred late at night on the side of the road, or that a number of officers were present — viewed individually or in combination — demonstrate an environment so inherently coercive that Stone could not freely give consent to the search.

¶ 39. Second, defendants assert that Stone was indisputably in police custody — indeed that he was effectively under

arrest without probable cause — thereby rendering his consent to search involuntary and "tainting" any evidence obtained therefrom. See *Sprague*, 2003 VT 20, ¶¶ 31-33 (holding that illegal seizure tainted defendant's subsequent consent to search); *State v. Chapman*, 173 Vt. 400, 403, 800 A.2d 446, 449 (2002) (recognizing that an investigative detention may become so intrusive as to become "the functional equivalent of a formal arrest"). Even if the circumstances supported defendants' claim that Stone was under de facto arrest, however, it would not necessarily render his consent involuntary or the evidence inadmissible. First, "custody alone has never been enough in itself to demonstrate a coerced confession or consent to search." *United States v. Watson*, 423 U.S. 411, 424 (1976). Indeed, as noted earlier, this and other courts have consistently held that "consent may be properly deemed voluntary even when a suspect is handcuffed and under arrest." *Sole*, 2009 VT 24, ¶ 24; accord *Jones*, 523 F.3d at 38-39 (upholding voluntariness of consent of suspect who had been handcuffed, *Mirandized* and questioned in custody); *Taylor*, 31 F.3d at 463-64 (finding that consent to search was voluntary after defendant was detained and read his *Miranda* rights); *State v. Harmon*, 910 P.2d 1196, 1208 (Utah 1995) (upholding voluntariness of consent from suspect who was under arrest and in handcuffs). Although Stone was in detention, nothing in the record suggests that he was subjected to any form of police coercion in granting consent to search the vehicle.

¶ 40. Furthermore, that the circumstances may — arguably — have elevated Stone's detention to the level of a de facto arrest does not invariably "taint" Stone's subsequent consent to search. Based on his initial observation of what he believed, in his experience, to be marijuana flakes, the investigating officer had at least a reasonable suspicion of wrongdoing sufficient to justify Stone's initial brief detention in the cruiser. See *State v. Ford*, 2007 VT 107, ¶ 4, 182 Vt. 421, 940 A.2d 687 (holding that reasonable and articulable suspicion of wrongdoing may support brief detention and questioning into circumstances that gave rise to suspicion). Defendants contend, however, that the initial detention, which lasted several minutes, was custodial in nature and therefore required not simply reasonable suspicion, but actual probable cause to arrest. See *Sole*, 2009 VT 24, ¶ 18 (while mere placement of driver in police cruiser does not render questioning custodial, further questioning about drug possession "turned what

might have remained a simple roadside inquiry during a routine traffic stop into an interrogation under circumstances approximating arrest").

¶ 41. Whatever the merits of this claim, the facts establish no causal nexus between Stone's brief initial detention and his later consent to search. As noted, the record shows that Stone denied any illegality; that the officer then left the cruiser to speak with the remaining passengers in the vehicle about what he believed to be marijuana, where he observed the cocaine and related packaging materials; and that he then returned to the cruiser, informed Stone about the contraband, and received consent to search during the subsequent colloquy. Nothing that occurred during the initial detention, therefore, appears to have caused the officer to approach and question the other passengers, observe the cocaine, or return to question Stone. We thus discern no basis to conclude that the initial detention led to or "tainted" the later consent. To the extent that there was any connection, however, we are satisfied that it was sufficiently attenuated by the several intervening events. See *Sprague*, 2003 VT 20, ¶ 32 (consent to search may be upheld where intervening significant events vitiate any taint arising from illegal detention).

¶ 42. Even assuming, however, that Stone was effectively in custody and under arrest when he actually consented to the search, the de facto arrest would only be illegal if the police at that point lacked probable cause. See *State v. Guzman*, 2008 VT 116, ¶ 16, 184 Vt. 518, 965 A.2d 544 (finding of probable cause to arrest does not require "formal[] arrest" of suspect since "[p]robable cause depends on whether there are objective facts to support such a finding, not whether the officers subjectively believed there was probable cause"). The standard for a finding of probable cause for a warrantless arrest is whether "the facts and circumstances known to an officer are sufficient to lead a reasonable person to believe that a crime was committed and that the suspect committed it." *State v. Chicoine*, 2007 VT 43, ¶ 8, 181 Vt. 632, 928 A.2d 484 (mem.). The question must be resolved in light of the totality of the circumstances, assessed in a "practical . . . common sense manner." *Guzman*, 2008 VT 116, ¶ 11 (quotation omitted).

¶ 43. Probable cause to arrest or search may be based on the observation of illegal drugs by an officer with the training and

experience to identify them as such. See, e.g., *State v. Delaoz*, 2010 VT 65, ¶ 20, 189 Vt. 385, 22 A.3d 388; *Guzman*, 2008 VT 116, ¶¶ 12-15. The testimony and affidavit of the investigating officer here stated that he initially observed green flakes on defendant Weisler which, according to his training and experience, he believed to be marijuana. He later observed in plain view on the floor of the vehicle a roll of cellophane wrap and a large clear baggie containing a white powder which, based on his training and experience, the officer believed to be cocaine. Many courts have found similar factual scenarios sufficient to support a finding of probable cause to arrest. See, e.g., *Blackmon v. United States*, 835 A.2d 1070, 1075 (D.C. Cir. 2003) (experienced officer had probable cause to arrest for possession of cocaine upon observing bag in vehicle containing white rock-like substance, and was not required to field test substance before arrest); *United States v. Rosario*, 638 F.2d 460, 462 (2d Cir. 1980) (officer's observation of suspect furtively carrying plastic bag containing white substance to vehicle supported probable cause to arrest for possession of cocaine); *State v. Jackson*, 778 So. 2d 23, 28-29 (La. Ct. App. 2000) (finding probable cause based on experienced officer's conclusion that plastic bag containing white powder on floor of suspect's car was cocaine); *Commonwealth v. Santana*, 649 N.E.2d 717, 722 (Mass. 1995) (trained officer had probable cause to seize clear plastic bag containing white substance observed during traffic stop where "its incriminating character was immediately apparent" (quotation omitted)); *State v. Flores*, 996 A.2d 156, 162-64 (R.I. 2010) (finding probable cause to arrest where, during traffic stop, officer observed two clear plastic bags containing white substance in car's center console).

■■ ■■ ¶ 44. Viewing the circumstances presented here in their entirety and in a "practical [and] . . . common sense manner," *Guzman*, 2008 VT 116, ¶ 11, we conclude that the officer's clear viewing of what appeared — based on his training and experience — to be cocaine on the floor of Stone's car, combined with his earlier observation of what he believed to be marijuana flakes, the packaging of the white substance which he recognized as "consistent with powdered cocaine," and the roll of cellophane wrap which is commonly used in packaging illegal drugs,[9] were suffi-

---

[9] See, e.g., *United States v. Lasso-Barrios*, 958 F. Supp. 283, 287 (W.D. Tex. 1997) (officers' discovery in van of incriminating evidence, including large roll of plastic

cient to establish probable cause to arrest.[10] We thus find no merit to the claim that Stone's consent was irremediably tainted by an illegal de facto arrest, and no basis to disturb the judgment.

*Affirmed.*

¶ 45. **Dooley, J.,** concurring and dissenting. The majority correctly acknowledges that the standard-of-review issue in this case conceals "layers of complexity" previously unexamined by this Court. *Ante,* ¶ 8. I am pleased that we are finally acknowledging that in *State v. Sprague,* 2003 VT 20, ¶ 24, 175 Vt. 123, 824 A.2d 539, *State v. Stevens,* 2004 VT 23, ¶ 10, 176 Vt. 613, 848 A.2d 330 (mem.), and *State v. Sole,* 2009 VT 24, ¶ 23, 185 Vt. 504, 974 A.2d 587, we have overruled decades of standard-of-review jurisprudence with no recognition that we have done so and no analysis of the relative merit of our action. Unlike the majority, however, I would rule that our recent change of direction is wrong and misguided and return to the deferential standard of review that has served us well. Accordingly, I dissent from the majority's standard-of-review holding. Under a deferential standard of review, I would affirm the district court's decision.

¶ 46. My disagreement takes two forms. I think our change of direction was wrong in any Fourth Amendment case for reasons I state below.[11] For purposes of this larger point, I conclude that this Court has the power to establish the standard of review, even for federal constitutional questions and even in the face of a contrary standard-of-review decision from the U.S. Supreme

---

wrap which "is commonly used to wrap marijuana," supported reasonable suspicion that van contained contraband); *Servis v. Commonwealth,* 371 S.E.2d 156, 158, 165 (Va. Ct. App. 1988) (holding that cellophane seized in connection with small amounts of marijuana and cocaine was part of "paraphernalia used in the packaging process" and therefore relevant to demonstrating intent to distribute (quotation omitted)).

[10] While asserting that he was effectively under arrest, Stone does not seek to suppress under *Miranda v. Arizona,* 384 U.S. 436 (1966), any unwarned statements that he made to the officer during the conversation, and we have held that a consent to search is not testimonial in nature and therefore does not require *Miranda* warnings even if the suspect is in custody. *Sole,* 2009 VT 24, ¶ 22.

[11] Since this is a case decided under the Fourth Amendment, I have limited my discussion to federal constitutional questions. We have also apparently chosen to adopt a de novo standard of review for criminal procedure cases decided under the Vermont Constitution. Again, I believe this change of standard of review is unwise and, in any event, overbroad. I will leave explanation of this position to a future case.

Court. I would follow a number of decisions from state supreme courts that have taken this position, and the view of many commentators. See *Clark v. State*, 287 S.W.3d 567, 572 (Ark. 2008); *State v. Ford*, 738 A.2d 937, 941 (N.H. 1999); *State v. Brockman*, 528 S.E.2d 661, 664-65 (S.C. 2000); *State v. Thurman*, 846 P.2d 1256, 1265-71 (Utah 1993); see generally R. Coombs, *A Third Parallel Primrose Path: The Supreme Court's Repeated, Unexplained, and Still Growing Regulation of State Courts' Criminal Appeals*, 2005 Mich. St. L. Rev. 541, 551-52 (stating it is a mistake for state court to assume it is bound by U.S. Supreme Court decisions requiring de novo review). There is no controlling U.S. Supreme Court precedent on this point.

¶ 47. My second disagreement is with the breadth of the majority holding and our earlier decisions. We have assumed that all motions to suppress should be decided on de novo review, without distinguishing between the underlying issues, see *State v. Pitts*, 2009 VT 51, ¶ 6, 186 Vt. 71, 978 A.2d 14, another indication that our recent standard-of-review decisions were hasty and only superficially considered. The majority has chosen not to reconsider these broad holdings, and they remain the law. There is no indication anywhere that the majority would change course as to other types of motions to suppress. Thus, I find the majority's assertion that this decision is only about the voluntariness of consent misleading.

¶ 48. As this case demonstrates, the issues underlying a motion to suppress can be very different, and the differences are significant for the question before us. As I argue below, even if some issues raised in motions to suppress should involve a de novo standard of review when they reach this Court, the issue of whether consent to search is voluntary should not be subject to de novo review. The decisions from other jurisdictions are overwhelmingly against de novo review in this instance, and I do not believe that the U.S. Supreme Court would adopt it even for the federal courts.

¶ 49. No act is more difficult for an appellate judge than to affirm a lower court decision the judge believes is wrong, and this decision should be viewed from that perspective. We are after all a higher court, and our view should prevail. The difficulty is enhanced if the decision involves an important constitutional right of a citizen. How can we fail to intervene if we believe that a litigant was the subject of an unreasonable and unlawful search and seizure?

¶ 50. We are, however, not omnipotent, and we have to accept that other judicial officers may have a better and more informed perspective on a case than we do. We develop limitations on our review responsibility with that point in mind. The central thesis of standards of review is that we should not allocate decisional responsibility based on power and stature, but instead on systems that best produce accurate and fair decisions of high quality. Those systems are not infallible either, and they occasionally produce results that appear to us to be wrong. As difficult as it may be to accept the apparently wrong decisions, overall the quality of decision-making is enhanced by the system.

¶ 51. We have a clear system of allocating decisional responsibility between the trial courts and the Supreme Court, and it has been developed and refined over hundreds of years. It best achieves accuracy and fairness in judicial decisions, and it best allocates limited resources. There is no evidence that it is in any sense broken or deficient, even when constitutional decisions are involved. We made a mistake in trying to "fix" it — a mistake we should correct today.

¶ 52. I will start with the narrower point, that the question of whether consent to search is voluntary should not be subject to de novo review in this Court. As the U.S. Supreme Court has said explicitly, see *Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973), and we have echoed, "[v]oluntariness is a question of fact to be determined by the totality of all the surrounding circumstances," *State v. Sheehan*, 171 Vt. 642, 643, 768 A.2d 1275, 1277 (2000) (mem.). Thus, under our long-standing precedents, we uphold the trial court's finding of voluntariness if "it is supported by the evidence and is not clearly erroneous." *Id.*; see also *State v. Beckley*, 157 Vt. 446, 450, 600 A.2d 294, 297 (1991) ("We will uphold a trial court's ruling on the voluntariness of a confession unless that conclusion is unsupported by the evidence or is clearly erroneous."); *State v. Stanislaw*, 153 Vt. 517, 532, 573 A.2d 286, 295 (1990) (discussing the voluntariness of confessions, this Court said, "the trial court's findings must stand if they are supported by substantial credible evidence and are not clearly erroneous" (quotation omitted)); *State v. Malinowski*, 148 Vt. 517, 520, 536 A.2d 921, 923 (1987) (noting that in cases involving asserted waivers of *Miranda* rights, "it was for the trial court to determine the weight and sufficiency of the evidence and the credibility of

the witnesses" and that therefore "the trial court's findings must stand if they are supported by substantial credible evidence and are not clearly erroneous"); *State v. Badger,* 141 Vt. 430, 444, 450 A.2d 336, 344 (1982) ("Voluntariness [of consent] must be evaluated on a factual basis . . . . [T]he State has not met its burden on appeal, and . . . there are ample factual findings to support the trial court's conclusion.").

¶ 53. In this case, the district court held an evidentiary hearing in which one officer — but none of the occupants of the vehicle — testified. It found, based on that testimony and a police-vehicle videotape of some of the events, that the consent to search was voluntary. Under our traditional standard of review, we should affirm that decision.

¶ 54. Our long-standing standard of review was based fundamentally on a policy choice of who should make this type of decision. See *Miller v. Fenton,* 474 U.S. 104, 114 (1985). The trial judge observes the witness and is positioned to develop the record to ensure that the relevant considerations can be contemplated. See *Malinowski,* 148 Vt. at 523-24, 536 A.2d at 925. The trial judge is in a better position to determine whether a defendant's consent was voluntary under all the circumstances present. We have explained this over and over again in countless contexts.

¶ 55. The majority concludes, however, that there are reasons to eliminate any deferential standard of review for certain constitutional facts, particularly whether consent to search is voluntary. In making its analysis, the majority emphasizes the reasons for eliminating any deference, but largely ignores any contrary reasons. We are free to develop our own jurisprudence in this area, and if we consider all of the relevant reasons, we should stay with our traditional standard of review, which has served us well.

¶ 56. Before I explain the reasons for my position, I want to explain the state of the law. Although not quite saying so, the majority specifically points to two U.S. Supreme Court decisions as requiring de novo review in this case: *Thompson v. Keohane,* 516 U.S. 99 (1995), and *Ornelas v. United States,* 517 U.S. 690 (1996). *Thompson* involves whether determining if a person is "in custody" for *Miranda* purposes is a question of fact for purposes of the federal habeas corpus statute, 28 U.S.C. § 2254(d), and therefore "presumed to be correct" in the federal proceeding under that statute. The Court held that, under the statutory language, mixed questions of fact and law are legal and consid-

eration of those questions, including whether a person is "in custody," is de novo. *Thompson*, 516 U.S. at 116. While *Thompson* may suggest the policy preferences of the Supreme Court, it is a statutory construction case that does not directly involve the issue before us. It is fundamentally about whether federal courts, particularly trial courts, should give deference to mixed fact-and-law determinations of state courts, not whether appellate courts should give deference to determinations of trial courts.

¶ 57. *Ornelas* is arguably closer because it involves Fourth Amendment issues and the proper standard of review. It held that the question of whether reasonable suspicion or probable cause is present is reviewed under a modified de novo standard. *Ornelas* observed that "[a]rticulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible," and that these are "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." *Ornelas*, 517 U.S. at 695, 696. In this context, *Ornelas* found that de novo review was necessary because the results of "sweeping deference . . . would be inconsistent with the idea of a unitary system of law," "legal rules for probable cause and reasonable suspicion acquire content only through application," and *"de novo* review tends to unify precedent." *Id.* at 697. Although the Court adopted a form of de novo review, it modified it to provide a degree of deference to the trial judge and local law enforcement officers. The Court said that the reviewing court should "give due weight to inferences drawn from [historical] facts by resident judges and local law enforcement officers," and termed giving weight to those inferences "deference." *Id.* at 699; see also *United States v. Arvizu*, 534 U.S. 266, 277 (2002). I note that the majority has rejected this part of the opinion. Its explanation that this part of *Ornelas* is about historical facts is wrong. As the quoted language. says, the Court's holding is about inferences drawn from historical facts — exactly the issue between the majority and this dissent.

¶ 58. We decided *Sprague* seven years after the Supreme Court decided *Ornelas* and, nevertheless, observed that "federal appellate courts uniformly apply a clearly erroneous standard to the voluntary-consent issue." *Sprague*, 2003 VT 20, ¶ 24. The situation is close to the same today. 6 W. LaFave, Search and Seizure § 11.7(c), at 449 (4th ed. 2004) ("the great majority of courts take the position that the clearly erroneous standard is appropriate");

see, e.g., *United States v. Pineda-Buenaventura*, 622 F.3d 761, 776 (7th Cir. 2010) ("We review a district court's finding of voluntary consent for clear error."); *United States v. $231,930.00 in U.S. Currency*, 614 F.3d 837, 844 (8th Cir. 2010) ("We review the district court's determination of whether a voluntary consent to a search was given under the clearly erroneous standard." (quotation omitted)); *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) ("In considering a challenge to a district court finding of consent, we are obliged to view the evidence in the light most favorable to the government. We will not reverse a finding of voluntary consent except for clear error." (citation omitted)); *United States v. Fornia-Castillo*, 408 F.3d 52, 62 (1st Cir. 2005) ("Typically, whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances. For that reason, a finding of voluntary consent (other than one based on an erroneous legal standard) is reviewable only for clear error, and the trial court's credibility determinations ordinarily must be respected." (quotation omitted)); *United States v. Carter*, 300 F.3d 415, 423 (4th Cir. 2002) ("When the government justifies a warrantless search under the 'voluntary consent' exception to the 4th Amendment's warrant requirement, the district court's factual determination as to whether consent to the search was actually given is reviewed for clear error."); *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001) ("Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances and reviewed for clear error."); *United States v. Van Shutters*, 163 F.3d 331, 335 (6th Cir. 1998) ("This court will accept a finding of voluntary consent unless it is clearly erroneous."); *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994) ("We review the district court's finding that [defendant] voluntarily consented to the search for clear error. Voluntariness is a question of fact to be determined from the totality of the circumstances." (citation omitted)). I do not believe that this Court is required to follow *Ornelas* even for the issues directly involved in the decision — probable cause and reasonable suspicion. The federal courts are, however, bound by the review standard for *Ornelas*, but few have been willing to extend it to whether consent to a search is voluntary, a comparable Fourth Amendment 'issue.

¶ 59. The majority takes me to task for not acknowledging that there are contrary decisions. I readily acknowledge that fact but

emphasize that the majority has adopted a rule supported by only a relatively small minority of courts around the country, a point the majority does not concede.

¶ 60. I suggest that there are three main reasons for the actions of the federal appellate courts in rejecting de novo review in these circumstances. The first is the placement of the U.S. Supreme Court decisions in context. This rationale was adopted in *United States v. Tompkins*, 130 F.3d 117 (5th Cir. 1997), in refusing to apply *Ornelas* to a voluntariness-of-consent issue:

> We decline Tompkins' invitation to employ *Ornelas'* two-tier standard when we review a district court's determination whether consent to search was given voluntarily. The Supreme Court reiterated its deferential standard of review for Fourth Amendment voluntariness determinations in *Ohio v. Robinette*, a post-*Ornelas* decision. The *Robinette* Court noted that voluntariness of consent to search is a question of fact; as such, it does not trigger the *de novo* review mandated by the Supreme Court in *Ornelas* for mixed questions of law and fact. The Supreme Court's refusal to depart from its established precedent, coupled with the virtually monolithic position of the circuits in affording deferential review to voluntariness inquiries raised by consensual searches, persuades us that Tompkins' reliance on *Ornelas* to mandate a change in our clear error standard of review is misplaced.

*Id.* at 120-21.

¶ 61. Second, and most important, the issue of whether consent to search is voluntary involves a determination of the defendant's state of mind, which is a question of fact, as the Supreme Court has held over and over. It is no less a question of fact where the "fact" is not directly observable. Thus, it is the kind of question for which appellate courts routinely give deference to the trial courts. See *Logan v. State*, 773 So. 2d 338, 343 (Miss. 2000) ("[The trial court] observes the witnesses first hand, hears the evidence and then determines whether the consent was, in fact, voluntary or not."); *State v. King*, 209 A.2d 110, 114 (N.J. 1965) ("The fact that the present case has to do with an ultimate finding of fact of constitutional dimension does not compel a different standard of appellate review. . . . [T]he determination whether consent was

voluntarily given is a factual issue to be decided by the trial judge; and the appellate court should reverse only when it finds that determination to be *clearly erroneous*."); *McFadden v. Commonwealth*, 300 S.E.2d 924, 926 (Va. 1983) ("[V]oluntariness is a factual question. The determination of such issue by the trial court on conflicting evidence will not be disturbed on review unless plainly wrong. Here, the factual decision turned on the credibility of witnesses — the law enforcement authorities versus the accused . . . ." (citation omitted)).

¶ 62. Not only is the question one of fact, it is a question of historical fact. The court must determine whether the consent to search was voluntary at the time it was given. This awareness is important because, in my judgment, the majority has created an artificial and unworkable distinction under which questions of historical fact are reviewed deferentially under a clearly erroneous standard, except when they are not, as in this case.

¶ 63. There are important differences between the question before this Court and those before the Supreme Court in *Ornelas* and *Thompson*. In *Thompson*, the issue was whether the defendant was in custody for *Miranda* purposes when he was interrogated. 516 U.S. at 107. In *Ornelas*, the issues were whether police officers had reasonable suspicion to stop a vehicle and probable cause to conduct a warrantless search. 517 U.S. at 695. In each case, the standards the Court created to resolve the issues were purely objective. See *Thompson*, 516 U.S. at 112 (articulating the standard as whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave"); see also *Ornelas*, 517 U.S. at 696 (reciting reasonable suspicion standard as whether there is a particularized and objective basis for suspecting the person stopped of criminal activity; for probable cause to search as whether the "known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found"). On these questions the perspective of the trial judge in hearing the evidence and seeing the witnesses is of lesser importance because the questions do not involve the defendant's state of mind, but instead the state of mind of a theoretical reasonable person. See *Thompson*, 516 U.S. at 113-14 (explaining that trial court credibility determinations are not involved in deciding whether reasonable person would feel free to terminate the interrogation and leave). Under these circumstances, there is less reason to give deference to the trial court's conclusion.

¶ 64. The issue in this case — whether defendant's consent to search was voluntary — is almost entirely subjective, based on all the relevant circumstances. See *Schneckloth*, 412 U.S. at 229-30 (describing all the surrounding circumstances a court must consider including the "possibly vulnerable subjective state of the person who consents"; the object of the inquiry is "the nature of a person's subjective understanding"); *United States v. Zaleski*, 559 F. Supp. 2d 178, 185 (D. Conn. 2008) (in determining voluntariness, the court "does not apply an objective standard"); *Basnueva v. United States*, 874 A.2d 363, 369 (D.C. 2005) ("test is subjective").[12] The majority's holding that voluntariness is an objective inquiry is a direct warring with *Schneckloth*, the controlling Supreme Court case, and is unwise. I understand that some courts have adopted the majority's rule, apparently based primarily on *Florida v. Bostick*, 501 U.S. 429, 439 (1991), a case that does not address whether voluntariness of consent is determined under an objective or subjective standard. In my view, these decisions are wrongly decided to the extent they generally decide that voluntariness of consent is always determined under an objective standard.

¶ 65. The trial judge's perspective in seeing and hearing the witnesses is very important in determining the actual state of mind of the defendant. Factual findings made from that perspective deserve deference and should not be reviewed de novo by appellate judges on a cold record.

¶ 66. A related difference involves the nature of the standards being applied. The standards in *Thompson* and *Ornelas* involve legal terminology that can be understood only in the context of

---

[12] As I discuss *infra*, the majority holds that we decided to the contrary in *Sprague*. *Ante*, ¶¶ 25, 32. That characterization of *Sprague* is wrong. One of the subsidiary questions in *Sprague* was whether the defendant was seized, and we explained the federal objective seizure standard — " 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " *Sprague*, 2003 VT 20, ¶ 26 (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). We applied that standard to the defendant's circumstances, holding that where the defendant's position in the police car was coerced under the *Bostick* objective standard, that circumstance should be considered in determining whether the defendant's consent was voluntary. See *id.* ¶ 28. This is not a holding that voluntariness is determined generally under an objective standard. The majority's characterizing it so is another example of the hasty and superficial analysis that is in the recent standard-of-review decisions. The point allegedly decided required detailed analysis in light of the United States Supreme Court decisions, an analysis missing from *Sprague*.

the many court decisions defining it and the origin and purposes of the standards. The Court observed in *Ornelas* that "[a]rticulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible," and that these were "fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed." 517 U.S. at 695-96. I do not think that either of these observations fairly applies to a determination of whether a consent to search is voluntary. Voluntariness should be determined primarily from the evidence and the common sense meaning of the word and not from appellate opinions. The perspective of the trial judge should play an important role in evaluating that evidence.

¶ 67. For related reasons, I do not believe that this case is controlled by *Miller v. Fenton*, 474 U.S. 104 (1985), which involved the voluntariness of a confession. *Miller*, like *Thompson*, involves the proper construction of the federal habeas corpus act, 28 U.S.C. § 2254(d), specifically whether a state court determination that a confession is voluntary "shall be presumed to be correct" in a federal habeas corpus action. 474 U.S. at 105-06. Contrary to the majority position, it does not contain a holding that appellate courts should review de novo trial court determinations of voluntariness. It does state that the U.S. Supreme Court has historically done so in appeals taken on certiorari from state courts. *Id.* at 110-11.

¶ 68. *Miller* contains important analysis that is inconsistent with the majority's position. First, the Court noted that while the state court conclusion on voluntariness is not presumed to be correct under § 2254(d), the federal court in a habeas corpus proceeding should "give great weight to the considered conclusions of a coequal state judiciary." *Id.* at 112. Thus, *Miller* should not be cited for the proposition that the Supreme Court favored giving no weight to the state court determination of voluntariness in a de novo review. Indeed, like *Ornelas*, the decision actually supports giving some deference to state court decisions.

¶ 69. Second, the Court made a number of observations that support deferential review in this case. It noted, "that an issue involves an inquiry into state of mind is not at all inconsistent with treating it as a question of fact." *Id.* at 113. It added that "an issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question." *Id.* The Court noted that the fact/law distinction "at times has turned

on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Id.* at 114. All of these observations cut against de novo review in this case.

¶ 70. Finally, the Court noted the uniqueness of determining whether a confession is voluntary, noting that it has two components: (1) "whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means"; and (2) "whether the defendant's will was in fact overborne." *Id.* at 116. The presence of the first component distinguishes the confession cases from others where voluntariness of an act is in question. Indeed, the Court specifically noted that "assessments of credibility and demeanor are not crucial to the proper resolution of the ultimate issue of 'voluntariness' " with respect to confessions, *id.*, I believe, because of the first component. I do not think that generalization is accurate with respect to the voluntariness of a consent to search.

¶ 71. The third reason that the controlling precedents are against de novo review is that the Supreme Court has been inconsistent in requiring de novo review, applying it to some mixed questions of fact and law and not to others, even though the others involve constitutional questions. See B. Adamson, *Federal Rule of Civil Procedure 52(a) as an Ideological Weapon?*, 34 Fla. St. U. L. Rev. 1025, 1064 (2007) ("Put bluntly, it is difficult to discern a principled reason why this inconsistency exists."). The majority's holding that all motions to suppress are reviewed de novo finds no support in the Supreme Court decisions. Even after *Ornelas*, and even if we were employing an objective standard, and even if we called the determination of voluntariness a mixed question of fact and law rather than a question of fact, it is unpredictable whether the Supreme Court would apply de novo review to the voluntariness of consent. Under these circumstances, it should not be unexpected that the federal courts of appeal have not changed the nature of their appellate review in determining whether consent to search is voluntary.

¶ 72. The situation is the same for the state appellate courts and for the same reason. A majority of states with supreme court decisions on this issue continue to maintain that great deference must be given to a trial court's determination of whether consent

was voluntary.[13] See, e.g., *Chism v. State*, 853 S.W.2d 255, 260 (Ark. 1993) ("We affirm a finding of voluntariness [of consent] unless that finding is clearly against the preponderance of the evidence."); *People v. James*, 561 P.2d 1135, 1139 (Cal. 1977) ("The question of the voluntariness of the consent is to be determined in the first instance by the trier of fact . . . . The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal . . . the trial court's findings . . . must be upheld if supported by substantial evidence." (quotation omitted)); *People v. Brazzel*, 18 P.3d 1285, 1289 (Colo. 2001) ("We defer to the trial court's findings of fact on the issue of voluntary consent, unless they are clearly erroneous."); *State v. Cobb*, 743 A.2d 1, 27 (Conn.

---

[13] In addition, numerous state appellate courts grant significant deference to the trial court on the issue of voluntary consent. See, e.g., *Kennedy v. State*, 640 So. 2d 22, 25 (Ala. Crim. App. 1993) ("When the evidence pertaining to the voluntariness of a consent is conflicting, the trial court is in the best position to determine consent or lack thereof. . . . On appeal, this court will not disturb the trial court's finding unless we are convinced that the conclusion is palpably contrary to the weight of the evidence." (quotation omitted)); *Punguk v. State*, 784 P.2d 246, 247 (Alaska Ct. App. 1989) ("The voluntariness of a consent to search is a question of fact to be determined by the trial court from the totality of the circumstances in each case. . . . [A] trial court's finding of consent to search must be accepted on appeal unless clearly erroneous."); *State v. Swanson*, 838 P.2d 1340, 1344 (Ariz. Ct. App. 1992) ("The trial court's factual determinations on the issue of giving consent will not be overturned unless clearly erroneous. . . . [W]e conclude that the trial court's determination that defendant voluntarily consented to the search was not clearly erroneous."); *State v. Breed*, 917 So. 2d 206, 209 (Fla. Dist. Ct. App. 2005) ("The voluntariness of the consent to search is a question for the trial court and should not be disturbed on appeal unless the determination is clearly erroneous."); *Corley v. State*, 512 S.E.2d 41, 45 (Ga. Ct. App. 1999) ("Normally we would rely upon the decision of the fact finder to determine the issue of consent, and if there was any evidence to support that finding the appellate court would not reverse such finding." (quotation omitted)); *State v. Reynolds*, 197 P.3d 327, 333 (Idaho Ct. App. 2008) ("Whether a consent to a search was voluntary is an issue of fact, and we therefore defer to the trial court's findings as to voluntariness."); *State v. Jones*, 932 N.E.2d 904, 917 (Ohio Ct. App. 2010) ("Even though the state's burden of proof [for voluntary consent] is 'clear and convincing,' this standard of review is highly deferential, and the presence of only some competent, credible evidence to support the trial court's finding requires us to affirm it." (quotation omitted)); *Commonwealth v. Merbah*, 411 A.2d 244, 247 (Pa. Super. Ct. 1979) (recognizing that lower court was not convinced that police action created coercive atmosphere that would render consent involuntary, and stating that "[g]reat deference should be given to the lower court's decision in light of its unique opportunity to observe the witnesses' demeanor and thereby assess credibility").

1999) ("Whether there was valid consent to a search is a factual question that will not be lightly overturned on appeal. The state has the burden to establish the voluntariness of the consent, and the trial court's finding in that regard will not be upset by this court unless clearly erroneous." (quotation omitted)); *Knight v. State*, 690 A.2d 929, 932 (Del. 1996) ("The trial judge's determination that a defendant's consent was voluntary will not be set aside on appeal unless that finding is clearly erroneous."); *State v. Ganal*, 917 P.2d 370, 380 (Haw. 1996) ("On appellate review, the findings of a trier of fact regarding the validity of a consent to search must be upheld unless clearly erroneous."); *People v. Pitman*, 813 N.E.2d 93, 109 (Ill. 2004) ("When the evidence on the issue of consent is conflicting, this court will uphold the circuit court's finding unless it is clearly unreasonable."); *Pate v. Commonwealth*, 243 S.W.3d 327, 330 (Ky. 2007) ("Whether consent is the result of express or implied coercion is a question of fact . . . and thus, we must defer to the trial court's finding if it is supported by substantial evidence." (quotation omitted)); *State v. Wilson*, 467 So. 2d 503, 518 (La. 1985) ("The voluntariness of defendant's consent to search is a question of fact to be determined by the trial judge under the facts and circumstances surrounding each case and the trial court's determinations as to the credibility of witnesses is to be accorded great weight on appeal."); *Commonwealth v. Carr*, 936 N.E.2d 883, 890 (Mass. 2010) ("Because a finding of voluntariness is a question of fact, it should not be reversed absent clear error by the judge."); *Logan*, 773 So. 2d at 343 ("When [the trial court's voluntary consent] ruling is contested on appeal, an appellate court may set aside that ruling only if that court is satisfied that the trial court was manifestly wrong in so deciding."); *State v. Patch*, 702 A.2d 1278, 1282 (N.H. 1997) ("In reviewing a trial court's finding of voluntary consent, we will not overturn the finding unless it is without support in the record." (quotation omitted)); *King*, 209 A.2d at 114 ("[T]he determination whether consent was voluntarily given is a factual issue to be decided by the trial judge; and the appellate court should reverse only when it finds that determination to be *clearly erroneous*."); *State v. Paul T.*, 1999-NMSC-037, ¶ 28, 993 P.2d 74 ("Whether consent was voluntarily given is a factual question, and the trial court's determination will not be disturbed on appeal unless it is not supported by substantial evidence."); *State v. Genre*, 2006 ND 77, ¶ 30, 712 N.W.2d 624

("Voluntariness is a question of fact to be resolved by the trial court, and because the trial court is in a superior position to judge credibility and weight, we show great deference to the trial court's determination of voluntariness." (quotation omitted)); *State v. Leigh*, 2008 SD 53, ¶ 16, 753 N.W.2d 398 (noting that trial court found no valid consent, and that supreme court would not reverse "even if we were convinced that the opposite finding would have been made had we been the fact finders, unless in light of the entire record we are left with a definite and firm conviction that a mistake has been made" (quotation and alteration omitted)); *McFadden*, 300 S.E.2d at 926 ("The determination of [voluntariness] by the trial court on conflicting evidence will not be disturbed on review unless plainly wrong."); *State v. Buck*, 294 S.E.2d 281, 285 (W. Va. 1982) ("[A] trial court's decision regarding the voluntariness [of consent to search] will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." (quotation omitted)).

¶ 73. I agree with the substantial majority of state and federal courts that apply deferential review to a determination of whether consent to search is voluntary. For the reasons given, I do not believe that the U.S. Supreme Court would rule that review of such voluntariness rulings should be de novo. For the additional reasons discussed in the next section of this dissent, I would not follow a contrary U.S. Supreme Court decision if it occurred.

¶ 74. Having stated my position on the narrow question before us, I turn to the broader question of whether we should ever use a de novo standard of review for motions to suppress based on constitutional claims, my response to the broad holding of the majority. In my view, we should not adopt a de novo review standard for multiple reasons.

¶ 75. First, there are no persuasive reasons why we should abandon deferential review of fact questions that determine constitutional rights while maintaining such review for other comparable questions. As discussed above, whether consent to search is voluntary is a question of fact involving a determination of the state of mind of the person who gave consent. Constitutional rights are important, but the consequence of the decision to the litigants may be no less great in other contexts where we defer to the trial judge's expertise and superior position in evaluating the evidence. Because our deference policy is based on the superior position of the trial judge to evaluate the evidence, a de

novo standard necessarily lessens the quality of the decision making. There is no evidence that fact-finding by this Court will result in better or more accurate decisions than those by trial judges. The whole point of our standard-of-review jurisprudence is that it will not. Thus, we are in the internally inconsistent position of reducing the quality of fact-finding because the facts involved are particularly important.

¶ 76. It is hard to see the majority decision as anything other than a negative assessment of the quality of fact-finding by trial courts with respect to federal constitutional questions.[14] I see nothing in our decisions, or the many records we read, to support this assessment.

¶ 77. It is also important to recognize that the alternative to de novo review is not ineffective review. We operated under a deferential standard of review for many, many years and were able to ensure that the full requirements of the Fourth and Fifth Amendments were implemented. Giving deference to a trial court's factual determination does not mean that we will uphold it if it is not supported by the evidence or that we will affirm conclusions that are inconsistent with applicable legal standards. A good example of this point is our decision in *State v. Roberts*, 160 Vt. 385, 388-90, 631 A.2d 835, 837-38 (1993), where defendant challenged successfully an inculpatory statement made to a police officer because the officer stated that the judge would probably consider the statement in determining the amount of bail. After explaining that the trial court's rulings on voluntariness will be upheld "unless . . . unsupported by the evidence or clearly erroneous," *id.* at 388, 631 A.2d at 837, this Court reversed the suppression of the statement because "[p]roviding factual information regarding defendant's situation does not render the confession involuntary." *Id.* at 389-90, 631 A.2d at 838.

¶ 78. Under the majority standard, the one actor whose analysis of the evidence is irrelevant is the trial judge. The result is that

---

[14] I am amazed that the majority resists this assessment. If the de novo standard of review is not based on an evaluation of the trial court's fact-finding on constitutional issues, why did we abandon hundreds of years of precedent to abruptly say that we will give no deference to a trial judge's fact-finding for certain factual issues? If that is not the motivation for the majority's ruling, why do we refuse to give even the deference called for in *Ornelas*? In the end, the only real rationale for the holding is that we trust ourselves to do constitutional fact-finding, but do not trust trial judges enough to give any deference to their findings.

no one will evaluate the demeanor of the witnesses and the inferences that can be made from their presentation. That loss is very significant in a case like this because defendant's claims are that the statements and actions of the officer were coercive, and that officer's testimony is the record before us. Because only their ultimate conclusion matters, trial judges have no incentive to provide a detailed analysis of the evidence where there is de novo review, and they are less likely to do so. As I discussed above, not even the U.S. Supreme Court has gone that far in reducing the role of the trial court. *Ornelas* held that appellate courts should "give due weight to inferences drawn from [historical] facts by resident judges." 517 U.S. at 699. The majority ignores that part of the *Ornelas* holding in requiring full de novo review.

¶ 79. Second, a de novo standard of review wastes limited judicial resources and increases the number of appeals. The standard of review is a significant factor in determining whether to appeal a trial court decision. G. Somerville, *Standards of Appellate Review*, 15 Litig. 23, 24-25 (1989). A very limited standard of review makes reversal of the trial court decision unlikely; de novo review means that there is no presumption of affirmance. The decision on a suppression motion to exclude evidence obtained in a search and seizure is often determinative of when the State can obtain a conviction. The overwhelming majority of our criminal cases involve publicly funded lawyers who are less concerned with the cost of an appeal than the potential results. With no presumption that the trial court decision is correct, they have every incentive to appeal in virtually all cases. A de novo appeal rule will increase the number of appeals and increase the waste from duplicative adjudications. I do not see this as a positive effect.

¶ 80. The third reason responds directly to the asserted reason for de novo review in Fourth Amendment cases. The Supreme Court in *Ornelas* reasoned that de novo review is "necessary if appellate courts are to maintain control of, and to clarify, the legal principles." 517 U.S. at 697, and added that "*de novo* review tends to unify precedent and will come closer to providing law enforcement officers with a defined 'set of rules.' " *Id.* (quotation omitted). The Court admitted, however, that for legal standards that involve multi-faceted analysis, one case is rarely precedent for another. *Id.* at 698.

¶ 81. The Supreme Court's analysis minimizes the effectiveness of deferential review to ensure the fair application of legal

principles and the full consideration of all relevant factors. Deferential review does not mean no review, as I discussed above using our decision in *State v. Roberts* as the example. We give no deference in determining the applicable law and in being sure it is applied. We give no deference if the trial court's conclusion is not supported by its findings or if the findings are inadequate. Even where we give deference to the trial court's conclusion, we may reverse that conclusion if we conclude that the trial court went beyond its discretion. In my opinion, our traditional standard of review results in a defined set of rules for guidance of trial courts and law enforcement officials. The whole point of deferential review is for the appellate court "to maintain control of, and to clarify, the legal principles." *Ornelas*, 517 U.S. at 697.

¶ 82. In my opinion, the improved results of de novo review are wishful thinking even if we ignore the loss of the perspective of the judicial officer who heard and saw the evidence. The Court argued that different results from different trial judges on the same facts "would be inconsistent with the idea of a unitary system of law." *Id.* The same criticism can be made of different appellate judges who, put in the role of fact-finder, will reach a different result from small variations in facts; and, of course, the makeup of appellate courts will change. Since we adopted de novo review of decisions on motions to suppress, many of our decisions have been divided, a not unexpected result where the Justices are acting as trial judges. As examples of the three-to-two decisions, see *State v. Muntean*, 2010 VT 88, 189 Vt. 50, 12 A.3d 518; *State v. Ford*, 2010 VT 39, 188 Vt. 17, 998 A.2d 684; *State v. Pitts*, 2009 VT 51; *State v. Pontbriand*, 2005 VT 20, 178 Vt. 120, 878 A.2d 227; *State v. Jestice*, 2004 VT 65, 177 Vt. 513, 861 A.2d 1060 (mem.). The content of these decisions also underscores my view that it is wishful thinking that de novo appeal decisions will give greater guidance to law enforcement than deferential review decisions. For example, in her dissent (which I joined) in *Pontbriand*, Justice Johnson noted that in some cases "no single factor is enough to overbear an individual's will, but the aggregate effect of many subtle, exploitive techniques is a coercive environment powerful enough to elicit an involuntary confession" and described thirteen nonexclusive factors the Colorado Supreme Court had adopted as relevant to a totality of the circumstances inquiry. 2005 VT 20, ¶ 36. As long as we must apply global standards like the totality of circumstances, I doubt our opinions on de novo review give any

better guidance to persons who must apply our decisions in their everyday conduct.

¶ 83. The Supreme Court admitted as much in *Ornelas*, noting that under multi-faceted substantive standards, "one determination will seldom be a useful 'precedent' for another," quoting *Illinois v. Gates*, 462 U.S. 213, 238 n.11 (1983), but noting occasional exceptions to this rule. 517 U.S. at 698. The presence of occasional exceptions hardly justifies a review standard built around giving law enforcement a set of rules with which to work. See *id.* at 703 (Scalia, J., dissenting) ("I do not understand why we should allow the exception to frame the rule").

¶ 84. To summarize, I would hold that we made a mistake in changing our standard of review of trial court suppression decisions to de novo review. Having joined in the mistake, I urge that we correct it. It was particularly a mistake to make such an important decision with little analysis. It was also a mistake on the merits of the question. I think that mistake should be corrected specifically for cases deciding whether consent to search was given voluntarily. I would go further, however, and return to our preexisting standard of review for decisions on motions to suppress asserting constitutional violations. Full consideration of the question, which we failed to do when we changed the standard of review, does not support de novo appellate review. Even if we adopt de novo review, we should specifically adopt and apply the deference component contained in the U.S. Supreme Court decisions. Accordingly, I dissent from this part of the majority decision.

¶ 85. I agree with the majority's result in this case, but would reach that result based primarily on the conclusion that the trial court's determination that the consent to search was voluntary was not clearly erroneous. I do not disagree with the majority's analysis, except in one critical respect. Relying upon an inapplicable holding from *Sprague*, 2003 VT 20, ¶ 28, the majority states that the voluntariness of consent is determined by an objective standard: "whether a *reasonable person* in the defendant's circumstances would . . . have felt free to refuse [consent]." *Ante*, ¶ 32. Contrary to this formulation, the standard is subjective and requires us to determine whether defendant's consent was voluntarily given in fact. See *supra*, ¶ 63. While the difference of standard is not determinative in this case, I believe it is a significant shift that we should not adopt.